# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 31, 2012

Lyle W. Cayce
Clerk

No. 11-50859

EVELYN M. LARBIE,

Plaintiff – Appellee

v.

DEREK LARBIE,

Defendant – Appellant

Appeal from the United States District Court
for the Western District of Texas

Before KING, PRADO, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

Plaintiff-Appellee Evelyn Larbie filed a petition under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), T.I.A.S. No. 11670, 19 I.L.M. 1501, *codified by* the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601, *et seq.*, seeking the return of her son, K.L., to the United Kingdom ("U.K."). The district court granted Evelyn's petition and ordered Defendant-Appellant Derek Larbie to turn K.L. over to Evelyn's care. The district court's application of the Convention here, however, effectively reverses a custody order entered after lengthy proceedings, culminating in a final divorce and custody order, in which neither party objected to the state court's jurisdiction, creating precisely the type of

No. 11-50859

international custody dispute that the Convention seeks to avoid. Accordingly, we VACATE the district court's order and RENDER judgment in Derek's favor.

## I. Facts and Procedural History

Derek and Evelyn are Ghanian nationals. Derek obtained naturalized citizenship in the United States and serves as an officer in the United States Air Force. Evelyn possesses permanent residency in the U.K.

Derek and Evelyn met in 2004, when he was stationed in Europe. They married in December 2005. At the time, they lived in San Antonio, Texas, because Derek was stationed at Lackland Air Force Base. K.L. was born in August 2006. Derek already had a son from a previous relationship.

Derek sponsored Evelyn for a "green card," which expired on June 27, 2009. Although Evelyn held a temporary work permit, she stayed home to care for K.L. The family remained in San Antonio except for several months when Evelyn temporarily returned to the U.K. and when Derek deployed to Iraq.

The marriage soon foundered. In March 2008, Derek filed for divorce in Texas state court. Shortly thereafter, Derek received orders to report in June for two months of training in preparation for a deployment to Afghanistan.

Evelyn responded to Derek's divorce petition by answer and counterpetition. In her counterpetition she asserted that she had been domiciled in Texas for at least six months and that she had resided in San Antonio for at least ninety days before the suit commenced. She also specified that no other court had jurisdiction over K.L.

Given Derek's impending overseas assignment, the Larbies entered into an agreed temporary divorce decree on June 11, 2008 (the "Temporary Order"). Among other things, the Temporary Order appointed Derek and Evelyn "Temporary Joint Managing Conservators" of K.L. and entered a "Standard Possession Order" outlining how the parties would spend time with him. The Temporary Order also gave Evelyn the authority to determine K.L.'s residence

2

No. 11-50859

"without regard to geographic location." However, it also provided that "[i]n the event that [K.L.] [was] to travel internationally," Evelyn had to inform Derek of the dates and location of such travel, the identity of those persons with whom K.L. was staying, and the telephone numbers at which K.L. could be reached "while [he was] traveling." The Temporary Order, moreover, ordered Evelyn to allow K.L. "weekly" visits with Derek's other son, and provided that various provisions were operative only so long as the "case [was] pending." Evelyn also received the right to "occupy" the "marital residence" and assumed the responsibility "for the care and upkeep of such residence," which was to "be kept in a substantially like condition of cleanliness as such residence was on June 14, 2008," the day before Derek reported for training. Derek was made responsible for paying a detailed list of expenses,[1] and Evelyn was given Power of Attorney to act as Derek's agent "with respect to addressing any matter which requires or pertains to the maintenance and service of all utilities associated with the residence."

On the same day the parties agreed to the Temporary Order, Derek moved to stay the proceedings pursuant to the Servicemembers Civil Relief Act, 50 U.S.C. app. §§ 501, *et seq.*, "until Sept. 1, 2009 or until such time as [he] return[ed] to Lackland Air Force Base at the conclusion of [his] deployment."[2] The Texas court granted Derek's motion to stay and entered the Temporary Order on July 23 and 24, 2008, respectively. The Temporary Order specified that it was to "continue in force until the signing of the Final Decree of Divorce or until further order of th[e] Court."

---

[1] The Temporary Order also required Derek to pay $800 per month in child and spousal support, an amount that increased to $1000 per month beginning September 1, 2008.

[2] The Servicemembers Civil Relief Act entitles members of the military to "[a] stay of an action, proceeding, attachment, or execution . . . for the period of military service and 90 days thereafter, or for any part of that period." 50 U.S.C. app. § 525(a).

No. 11-50859

A few weeks after Derek left for training, Evelyn bought a plane ticket to travel to London on July 12th. Evelyn took only what was "permissible on the aircraft," leaving behind "substantially all" of her and K.L.'s "clothing and personal effects" and giving no indication that the trip was anything other than temporary. She and Derek exchanged e-mails that indicated her intent to return to San Antonio.

Derek deployed to Afghanistan. He subsequently learned that he would be allowed mid-deployment leave in March 2009. Reasoning that this coincided with the "Spring Break" visitation provisions in the Temporary Order allowing him 24-hour custody of K.L. during that time, he planned to spend a portion of his leave in London. Evelyn, however, refused to allow Derek visitation under the Temporary Order's terms.

Derek filed a "Motion to Clarify" the Temporary Order in the Texas court, which was granted (the "Clarification Order"). The Clarification Order found that the visitation provision was "binding on the parties . . . and that, for purposes of spring break visitation for the year 2009, the spring break schedule for the school district in which the marital residence sits [would] govern the dates of visitation." Responding to Evelyn's concern that exclusive 24-hour custody might "traumatize[]" K.L., the Clarification Order provided that Derek's visitation occur for twelve hours a day from March 7th to March 15th, with K.L. staying at Evelyn's residence overnight.

Evelyn declined to honor the Clarification Order, and Derek sought enforcement via U.K. authorities.[3] A U.K. family court enforced the Texas order

---

[3] Evelyn contended to the district court that she and Derek's U.K. counsel agreed in this process that K.L.'s "habitual residence was England." There is no evidence of such an agreement in the record. Although Evelyn apparently contemplated obtaining a residence order, she admitted to the district court that she never sought custody of K.L. in the U.K. courts. A residence order is the U.K. equivalent of a custody order and different from the contact order Derek obtained to enforce the Clarification Order. *See* Children Act 1989, c. 41, Part II, § 8(1) ("In this Act—'a contact order' means an order requiring the person with whom

No. 11-50859

by entering a "contact order" under the U.K. Children Act 1989 that required Evelyn to allow Derek visitation on the same dates and times ordered by the Texas court. Derek and his other son visited K.L. during "Spring Break," and Derek returned to Afghanistan.

K.L. had entered the U.K. on a limited-duration visitor's visa that expired in early 2009. Without notifying Derek, Evelyn had filed an application to obtain permanent resident status for K.L. in autumn 2008. A U.K. immigration official denied that application on June 23, 2009, in part because Evelyn failed to show that she was "'present and settled in the [U.K.] and . . . had sole responsibility for [K.L.'s] upbringing.'" The official also reasoned that the Temporary Order "'impl[ied] that the final decision regarding [K.L.'s] place of residence and which of [his] parents will have primary responsibility for [his] upbringing will not be decided until [his] parents' final decree is signed.'" The official saw "'nothing to indicate that [Derek had] agreed to [K.L.'s] residing in the [U.K.] permanently with [his] mother.'" Evelyn immediately appealed.

Days later, Evelyn asked the Texas court to set the divorce for a final hearing. In her motion, Evelyn stated that she had returned to Texas and discovered that her immigration paperwork was missing from the marital residence. These documents were crucial, Evelyn argued, because without them she could not "retain her current green card status in the United States."

On June 30, 2009, Evelyn, her attorney, and Derek's attorney attended a hearing in San Antonio (the "June 30th Hearing"). Contending that K.L. could be "ejected from England at any point in time," Evelyn's counsel "ask[ed] either that the [Texas] Court order [Derek] to give consent for K.L. to have residency

---

a child lives, or is to live, to allow the child to visit or stay with the person named in the order, or for that person and the child otherwise to have contact with each other . . . ."); *Fawcett v. McRoberts*, 326 F.3d 491, 498-500 (4th Cir. 2003)(discussing residence and contact orders in the context of the analogous Children (Scotland) Act), *overruled on other grounds by Abbott v. Abbott*, 130 S. Ct. 1983 (2010) (*Abbott II*).

in London . . . [o]r . . . lift the stay" to allow the parties to "litigate [the divorce] issue, because . . . in order for [Evelyn] to remain in the United States, she's either got to be divorced or she's got to have sponsorship." Evelyn's attorney represented at least two more times in the relatively brief hearing that Evelyn hoped to maintain permanent residence in the United States.[4]

Derek's attorney noted that he had been served with "full blown discovery" shortly before the hearing and argued that Derek's continued deployment mandated that the stay remain in place. In response to the judge's questioning, the attorney admitted that he could not think of a solution to K.L.'s visa problem. He reiterated, however, that Derek ultimately sought full custody.

The judge then proposed a potential solution: "what if [the parties] did some kind of an order that said, the Court finds that this temporary order that was agreed to by the parties signifies [Derek's] consent for [K.L.] to temporarily reside with [Evelyn] in London, until such time as the Court hears . . . further orders in . . . October of 2009 or something[?]" The attorneys agreed "that might do the trick." As the judge repeatedly made clear, however, any consent for K.L. to stay overseas was to temporarily avoid separating him from Evelyn and should not "prejudice [Derek's] right to come back here and conduct a custody trial in the future."[5] Yet, the judge also warned the parties that if they could not reach an agreement along the lines she had proposed, she would not rule out

---

[4] Specifically, Evelyn's attorney claimed that certain "documents ha[d] been removed from the house that she need[ed] to even establish residency here," and that Evelyn "had to come down here[] because she wanted to try to maintain some green card status."

[5] The Texas judge mentioned, among other things, that "one thing that we need to make sure that we do is that there is an iron clad enforceable agreement that everybody agrees to come back to Texas in October or whenever it is [that Derek returns] to permit this custody hearing to occur." She also observed that Derek would not "want[] to sign off on something where he is not going to then be able to get the child back here for a hearing."

lifting the stay and finalizing the divorce. The attorneys agreed to work on an agreed order and to come back before another judge in a few days.[6]

The next day, Derek's attorney sent Derek an email about the "emergency" proceedings. Attached to the email was an affidavit for Derek's signature giving consent for K.L. to "reside" with Evelyn. In line with the discussion at the June 30th Hearing, Derek's attorney suggested that any consent would be valid only through Derek's return to the United States, noting that they would "have to have a side agreement between [Evelyn], her lawyer, and [Derek's attorney] that [K.L.'s] residence in England is not permanent and that he shall be returning to the US eventually and that this case shall proceed here and only here in Texas." Derek signed the affidavit on July 6, 2009 (the "Consent Affidavit"). In it, Derek affirmed that he was K.L.'s biological father, reported that he was "currently deployed in Afghanistan," and gave his consent for K.L. to "reside with his mother . . . in England," which he considered to be in K.L.'s "best interest." The same day, Derek emailed the affidavit to his attorney, writing only that he had "read, signed[,] and attached the consent form as discussed."

On July 2nd—just two days after the June 30th Hearing—Evelyn filed an amended counterpetition in the Texas court. Consistent with her stated desire to maintain permanent residency in the United States, the counterpetition again stated that Evelyn had been domiciled in Texas for the preceding six months and had been a resident of Bexar County, in which San Antonio is located, for the preceding ninety days. Evelyn also sought "the exclusive use and possession" of the marital residence and an injunction against Derek's "entering or remaining on the premises." The counterpetition further asked the Texas court to appoint Evelyn as sole managing conservator of K.L. and to enter certain "temporary" child support and spousal maintenance provisions "until a final decree [was]

---

[6] The Bexar County district courts generally employ a "rotating" docket for hearings such that different judges may hear motions filed at various times in a single case.

signed." The counterpetition also disavowed that K.L. was "under the continuing jurisdiction of any other court" or subject to any "court-ordered conservatorships, court-ordered guardianships, or other court-ordered relationships."

The second hearing on Evelyn's motion to lift the imposed stay was held on July 6, 2009—the same day that Derek signed and emailed the Consent Affidavit. Evelyn's representations differed from those made at the June 30th Hearing in at least two crucial aspects. This time, Evelyn's counsel reported that U.K. immigration officials had scheduled K.L.'s deportation for July 9th, just three days away, and that Evelyn "could never come back over here and live with her child" because her green card had expired.[7]

Derek's attorney had not yet heard back from Derek about the Consent Affidavit and announced "not ready." He argued that any action without Derek's participation violated the Servicemembers Civil Relief Act, but attempted to work out some sort of agreement. The judge allowed a brief recess to attempt contact with Derek, but he was unreachable.

Based on the alleged emergency, the judge crafted a compromise. She "order[ed] that [Derek] sign the consent form to do a status quo. In the event he fail[ed] to do that, [the judge would] enter a divorce decree." Although the decree would "grant the divorce and grant custody," it would only be a temporary arrangement to prevent K.L.'s deportation. After entry of the decree, the judge proposed that a motion for new trial be filed by Evelyn's attorney to "prevent it becoming a final order until [Derek was] able to get back from Afghanistan."

---

[7] Both of these claims were questionable. Nothing in the record supports K.L.'s imminent deportation. His residency appeal would not be decided until September, and he was not deported. Furthermore, the expiration of Evelyn's permanent residence status in the United States was not a new development. Her green card had expired on June 27, 2009, three days before the June 30th Hearing. Evelyn's counsel nonetheless contended that the only way to prevent K.L.'s deportation was to grant a divorce or to have Derek sign the consent form.

The judge noted that she did not expect Derek's attorney to agree to this solution. In fact, when Derek's attorney asked for sanctions and attorneys' fees under the Servicemembers Civil Relief Act, the judge promised to take up those issues when "we really do have a final hearing." The judge was explicit that this arrangement would "not prejudice [Derek] for his custody suit" and that he was "not in any way precluded from coming back and obtaining [custody]—and [that] if he want[ed] to come back sooner, [she would] grant him a new trial."[8]

Although Derek emailed the Consent Affidavit to his attorney on July 6th, there apparently was some objection to Derek's failure to have it notarized. The Texas court therefore entered a "final" divorce decree on July 30, 2009, awarding Evelyn sole managing conservatorship over K.L. but notably omitting the Temporary Order's "without regard to geographic location" modifier. Evelyn forwarded the "final" divorce decree to U.K. immigration authorities.

Derek returned from Afghanistan just over two weeks later. He quickly filed motions for a new trial and to lift the stay. The Texas court entered an agreed order granting the motion for new trial on August 26, 2009.

A U.K. immigration appeals judge granted K.L. permanent residency in the U.K. a week later, but not because Evelyn had been granted sole managing conservatorship. Rather, the judge found that it was "quite clear from the [Texas court] documents that both parents retain[ed] a significant responsibility for the care of [K.L.]" and that Evelyn's "evidence [was] far from showing that [she] ha[d] sole responsibility for [him]." Indeed, the U.K. judge noted that it was "not in dispute that suitable arrangements [had] been made for [K.L.'s] care both as a result of the American divorce proceedings and as a result of [Evelyn's] financial condition." The judge thus affirmed the rejection of K.L.'s application

---

[8] We do not address whether the Texas court's actions violated Derek's rights under the Servicemembers Civil Relief Act and what effect, if any, such violations would have on considerations under the Convention.

under the U.K. law provision relied upon in the original decision. The judge instead granted the appeal based on a provision allowing permanent residency in cases where "one parent is present and settled in the [U.K.] and there are serious and compelling family or other considerations which make exclusion of the child undesirable."

Derek filed a "Motion for Additional Temporary Orders" on September 16, 2009, seeking extended visitation with K.L. in the U.K. The Texas court granted the motion on September 30th, and ordered Evelyn to allow Derek three weeks of "continuous and unrestricted (twenty four (24) hours per day) visitation with K.L." from October 20th to November 10th. Evelyn lodged no objections to this order even though she originally opposed Derek's visitation request.

With Derek's return, the divorce proceedings turned to discovery. The record suggests that Evelyn refused to comply with several discovery requests and court orders. Derek filed motions to compel, for sanctions, and for a continuance. After a December hearing, the Texas court granted Derek's requests, ordering Evelyn to respond to the discovery requests and to pay Derek $1538 in sanctions. Trial was continued to March 1, 2010.

Evelyn failed to comply with the order, and Derek filed another motion to compel and other motions. The Texas court granted these requests by, among other things, giving Derek the exclusive right to occupy the marital residence, ordering Evelyn to comply with certain discovery requests, and setting other matters for a hearing. Evelyn was ordered to bring K.L. to the hearing.

On February 4th, the Texas court issued a multi-part order addressing several pending matters. Among other things, the order provided that Derek discontinue child and spousal support payments as a sanction for Evelyn's failure to bring K.L. to the hearing; that Evelyn comply with the outstanding discovery requests and finish paying the previously ordered sanction; that Evelyn was prohibited from raising certain issues in future proceedings; and

that Evelyn pay an additional $1200 in sanctions for her failure to abide by various orders. The order also imposed heavy sanctions for her conduct, but allowed her to fully participate in the final divorce hearing if she complied with all unresolved orders and discovery requests by March 1, 2010.[9]

Evelyn apparently complied with the sanction order, as well as an order to bring K.L. back to the United States for the trial. The Texas court heard arguments on March 1 and 2, 2010. Derek and Evelyn both testified, along with an immigration specialist and an accountant.

The Texas court entered a "Final Decree of Divorce" on May 25, 2010 (the "Final Decree"), finding that it had "jurisdiction of [the] case and of all the parties." It appointed Derek and Evelyn as joint managing conservators of K.L., with Derek as the possessory parent, and found that such an arrangement was in K.L.'s "best interests." Because the parties "reside[d] in different and remote countries," the Final Decree imposed a custom possession order rather than the Texas Standard Possession Order used in the Temporary Order. In lieu of child support, Evelyn was ordered to pay "all costs of travel associated with her visitation" rights. Unlike the Temporary Order, the Final Decree contained a mutual *ne exeat* provision that required each party to obtain "written authorization" from the other to take K.L. "beyond the territorial limits of the United States," provided that during her periods of possession, Evelyn had the right to take K.L. to England, Scotland, and Wales. Before removing K.L. from the United States, however, the Final Decree obligated Evelyn to post a $25,000 bond in Derek's favor. The Texas court gave Derek "the exclusive right to designate the primary residence of [K.L.] without regard to geographic location," and found "that the United States of America is the country of habitual residence of [K.L.]"

---

[9] These sanctions would have resulted in the Texas court striking Evelyn's pleadings and entering a default judgment in Derek's favor.

No. 11-50859

Derek took possession of K.L. shortly after the trial ended. Evelyn appealed and in January 2011 filed a "Motion to Modify and Motion for Clarification" of the Final Decree. Citing financial difficulties resulting from a pregnancy, Evelyn requested that the Texas court order Derek to pay for her travel costs and to forego the $25,000 bond requirement. Evelyn argued that the bond provision should be lifted because "she ha[d] always subjected herself to the jurisdiction of the Bexar County Courts and ha[d] always returned the child promptly after each visit." The record does not show how that motion was decided, but the Bexar County Court docket shows that the underlying divorce proceeding has been "disposed." Evelyn dismissed her appeal following the district court's order in this case. *See Larbie v. Larbie*, No. 04-10-00593-CV, 2011 WL 3849492 (Tex. App.—San Antonio Aug. 31, 2011, no pet.).

On February 25, 2011, Evelyn initiated this action by filing a Convention petition, an accompanying affidavit, and a copy of a Convention application filed with the Central Authority for England and Wales. The district court scheduled an evidentiary hearing, at which both parties testified and presented evidence. The parties submitted brief summation arguments in writing.

The district court granted Evelyn's petition on August 10, 2011, and ordered that Derek immediately return K.L. to Evelyn's possession. The district court reasoned that Evelyn met her burden under the Convention by showing, by a preponderance of the evidence, that Derek "wrongfully retained" K.L. in the United States. Specifically, the district court found (1) that the U.K. was K.L.'s "habitual residence" under the Convention; (2) that Derek breached Evelyn's U.K. custody rights by retaining K.L. pursuant to the Final Decree; and (3) that Evelyn was actually exercising her U.K. custody rights at the time of retention. Evelyn departed for the U.K. with K.L. in tow. Derek timely appealed.

No. 11-50859

## II. This Appeal is Not Moot

Evelyn primarily hinges her defense to Derek's appeal on a single issue. In her view, this court should adopt the reasoning of the Eleventh Circuit's opinion in *Bekier v. Bekier*, 248 F.3d 1051 (11th Cir. 2001), and hold that this case is moot in light of K.L.'s return to the U.K. The petitioner in *Bekier* took his son from the United States to Israel immediately after the district court resolved the Convention issue in his favor. The Eleventh Circuit dismissed the respondent's appeal, reasoning that it could provide her "no actual affirmative relief" because any "potential remedies . . . lie in the Israeli courts." *Id.* at 1054.

*Bekier*, however, is inconsistent with the grain of circuit authority. Indeed, the Third and Fourth Circuits—the only other circuit courts to rule on the issue—have explicitly rejected *Bekier*'s approach. *See Whiting v. Krassner*, 391 F.3d 540, 544-46 & n.2 (3d Cir. 2004) (characterizing *Bekier*'s analysis as "unconvincing"); *Fawcett v. McRoberts*, 326 F.3d 491, 494-97 (4th Cir. 2003), (criticizing *Bekier* for ignoring a "wealth of authority" contrary to its holding and for relying on cases with "markedly different facts" and sought-after remedies that were "impossible" to grant), *overruled on other grounds by Abbott v. Abbott*, 130 S. Ct. 1983 (2010) (*Abbott II*). The Tenth Circuit refused to find that a child's location supports mootness in a pre-*Bekier* case, reasoning that to rule otherwise would "give parents an undue incentive to flee from Hague Convention proceedings." *Ohlander v. Larson*, 114 F.3d 1531, 1538-39 (10th Cir. 1997). It has not retreated from that approach. *See Leser v. Berridge*, 668 F.3d 1202, 1210 (10th Cir. 2011) (appeal moot on other grounds); *Navani v. Shahani*, 496 F.3d 1121, 1132 (10th Cir. 2007) (same). Although not discussing mootness, the Eighth Circuit has ruled on a Convention appeal in a case where the subject child left the United States after district court proceedings ended. *See Rydder v. Rydder*, 49 F.3d 369 (8th Cir. 1995). The First Circuit has also observed that "[w]hile it is true that the process for the adjudication of Hague Convention

petitions should be as quick as possible, neither the Convention nor [ICARA] restricts the appellate process." *Walsh v. Walsh*, 221 F.3d 204, 214 (1st Cir. 2000) (internal citation omitted).

We hold that Derek's appeal is not moot for basically the reasons articulated by the *Fawcett* court. *See* 326 F.3d at 494-97. "'[C]ompliance [with a trial court's order] does not [ordinarily] moot an appeal [of that order] if it remains possible to undo the effects of compliance or if the order will have a continuing impact on future action.'" *Id.* at 494 (citation omitted; first alteration added). The Convention and U.K. law perhaps best demonstrate that granting Derek relief can "'affect the matter in issue.'" *Id.* (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)). Both provide a "mechanism for enforcing a judgment by this court or the district court on remand." *Id.* at 496-97 (noting also that the U.K. equivalent of ICARA allowed appellant to enforce Convention judgment in U.K. courts). It also is possible that Evelyn could voluntarily respond to an order requiring K.L.'s return or risk contempt sanctions. *Id.* at 497. As Evelyn herself has observed, she has always submitted to the jurisdiction of American courts and has never disobeyed an order requiring her presence in the United States. In the event she does return, Derek could domestically enforce the Final Decree as well as the denial of Evelyn's petition. *Id.* Our decision may also have implications as to Derek's liability for Evelyn's fees and costs, which she has requested below, as well as any future custody proceedings. *See Whiting*, 391 F.3d at 546.

Evelyn simply dismisses these possibilities as "absurd" and "convoluted" and argues that *Bekier* provides a "very practical and common sense approach." Her only substantive point seems to be that *Bekier*'s supposedly analogous facts mandate that this court reach the same result.[10] She fails, however, to show

---

[10] *Bekier* differs from this case in that the district court there returned the child to the country in which a permanent custody order already existed, and the child had no pre-

14

No. 11-50859

that Derek cannot obtain the forms of relief outlined in *Fawcett* and *Whiting*, as is her "'heavy burden'" as the party seeking refuge in mootness. *Del-Ray Battery Co. v. Douglas Battery Co.*, 635 F.3d 725, 729 (5th Cir. 2011) (citation omitted). Accordingly, we follow the Third and Fourth Circuit's lead and decline to adopt *Bekier*'s approach.

### III. Guiding Principles

We turn, then, to the merits of Evelyn's case. Resolving disputes under the Convention implicates multiple standards of review. Generally, this court reviews factual findings for clear error and conclusions of law *de novo*. *See, e.g.*, *England v. England*, 234 F.3d 268, 270 (5th Cir. 2000). A factual finding survives review so "'long as it is plausible in the light of the record as a whole.'" *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 342 (5th Cir. 2004) (citation omitted). A district court's "habitual residence" determination, however, presents a mixed question of law and fact subject to *de novo* review. *See, e.g.*, *Barzilay v. Barzilay*, 600 F.3d 912, 916 (8th Cir. 2010).[11]

The Convention has two primary "objects": (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and" (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention

---

abduction connection to the United States.

[11] We have considered Convention-related appeals in only three published cases: *England*, *Sealed Appellant*, and *Abbott v. Abbott*, 542 F.3d 1081 (5th Cir. 2008) (*Abbott I*), which the Supreme Court overruled in *Abbott II*, 130 S. Ct. 1983. Two of these cases addressed narrow issues that have no salience here. *England* addressed the Convention's "grave risk" and "age and maturity" exceptions, and *Abbott I* primarily concerned whether *ne exeat* clauses vest a custody right in their intended beneficiaries.

We also confronted Convention-related matters in two unpublished cases. *See Dietz v. Dietz*, 349 F. App'x 930 (5th Cir. 2009); *Grube v. Grube*, 285 F. App'x 145 (5th Cir. 2008). Both short per curiam opinions, *Dietz* and *Grube* provide limited guidance. *Dietz* concerned the Convention's one-year limitations and "age and maturity" exceptions. The two-paragraph *Grube* opinion disposed of the respondent's three issues on appeal as frivolous and waived.

art. 1. These goals stand in "potential conflict" because the "desire to protect factual situations altered by the wrongful removal or retention of a child" may promote ends that are in disharmony with "respect for the legal relationships which may underlie such situations." Elisa Pérez-Vera, Explanatory Report ¶ 9, *in* 3 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 428 (1982) (the "Explanatory Report").[12] Thus, although the Convention "is not essentially concerned with the merits of custody rights[,] . . . the characterization of the removal or retention of a child as wrongful is made conditional upon the existence of a right of custody which gives legal content to a situation which was modified by those very actions which [the Convention] is intended to prevent." *Id.* Accordingly, "a refusal to restore a child to its own environment after a stay abroad to which the person exercising the right of custody had consented must be put in the same category" under the Convention as situations where a person entitled to possess a child removes or retains it outside of its "habitual environment." *Id.* at ¶ 11.

The Convention uses the phrases "wrongful removal or retention" and "right of custody" as terms of art. A removal or retention is "wrongful" under the Convention when (1) "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and" (2) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention art. 3. The Convention considers "rights of custody [to] include rights relating to the care

---

[12] "Elisa Pérez-Vera was the official Hague Conference reporter, and her explanatory report is 'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.'" *Mozes v. Mozes*, 239 F.3d 1067, 1070 n.3 (9th Cir. 2002) (citation omitted); *see also Robert v. Tesson*, 507 F.3d 981, 988 n.3 (6th Cir. 2007) (noting that the Explanatory Report is considered "an authoritative source for interpreting the Convention's provisions" (citations omitted)).

of the person of the child and, in particular, the right to determine the child's place of residence." Convention art. 5(a). These rights differ from "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Convention art. 5(b).

The Convention inquiry, then, consists of three elements, which the petitioner must establish by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(1). First, the petitioner must show that the respondent removed or retained the child somewhere other than the child's habitual residence. *See, e.g.*, *Whiting*, 391 F.3d at 546-51; *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2002). If so, the question becomes whether the removal or retention violated the petitioner's "rights of custody" under the habitual-residence nation's laws. *See, e.g.*, *Fawcett*, 326 F.3d at 498-501; *Sealed Appellant*, 394 F.3d at 343. These rights need not be enshrined in a formal custody order issued before the removal or retention; the Convention also recognizes rights of custody that arise "*ex lege*." Explanatory Report at ¶ 68; *see also* Convention art. 3 ("The rights of custody mentioned . . . above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."). Assuming that the petitioner has rights of custody, she then need only make the final, and "relatively easy," Explanatory Report at ¶ 73, showing that "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Convention art. 3(b). Generally, courts "'liberally find'" that rights of custody have been exercised unless evidence demonstrates "'acts that constitute clear and unequivocal abandonment of the child.'" *Sealed Appellant*, 394 F.3d at 344-45 (citation omitted).

Convention respondents may assert "several narrow affirmative defenses to wrongful removal." *Id.* at 343. Pertinent here, a court has no obligation to order a child's return if the respondent shows by a preponderance of the evidence

that the petitioner (1) "was not actually exercising the custody rights at the time of removal or retention," or (2) "had consented to or subsequently acquiesced in the removal or retention."    Convention arts. 12 & 13(a)[13]; 42 U.S.C. § 11603(e)(2)(B).

## IV. Evelyn "Consented" and "Acquiesced" Under the Convention

We conclude that Derek prevails.  Indeed, the record suggests that the petition process here effected what otherwise would be considered a wrongful removal under the Convention.  Rather than "prevent[ing] the consolidation in law of [an] initially unlawful factual situation[]" by placing the "questions of custody rights . . . before the competent tribunals," Explanatory Report at ¶ 40, the district court's order has the effect of undoing the custody arrangement ordered by the Texas court of competent jurisdiction—before which both parties participated and sought relief—in favor of relitigating custody before tribunals that, until this proceeding, Evelyn never argued had authority over the matter.

Derek thus contends that Evelyn consented to the Texas court's resolution of the custody issue and "waived" recourse to the Convention by failing to raise it in the Texas court.  The district court, however, held that Evelyn's "[m]erely participating in the Texas divorce and custody proceedings [was] not consent to [K.L.'s] removal or retention in Texas."  According to the district court, Evelyn attended the final divorce proceedings "under compulsion of the Texas court's order," belying the voluntariness of her participation.  Similarly, the district

---

[13] Article 13(a) of the Convention in relevant part provides:

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –

a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention . . . .

court believed that "[t]here was nothing consensual or voluntary in her surrender of her son."

Under Article 13(a), "[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) (citation omitted). "[T]he law construing the consent defense under the Convention is less developed," but the few reported cases provide some general principles. *Id.* The focus of inquiry is "the petitioner's subjective intent," *id.*, as "evinced by the petitioner's statements or conduct, which can be rather informal."[14] *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010) (citations omitted). "In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Baxter*, 423 F.3d at 371.

Crucially, consent for a particular tribunal to make a final custody determination—which may be established by entry of a temporary custody order—suffices to establish an affirmative defense under the Convention. *See Nicolson*, 605 F.3d at 106-07 ("The consent order in this case provided only for temporary custody but, if it were read as agreeing to let the Maine courts determine final custody . . . , we would think that this was an acquiescence or, alternatively, a waiver of Hague Convention rights." (citation omitted)); *cf.*

---

[14] Because the petitioner's "subjective intent" is the touchstone for both "consent" and "acquiescence" under Article 13(a), the two concepts are essentially coterminous for Convention purposes. *See Baxter*, 423 F.3d at 371-72. The terms appear to be distinguished only by their temporal focus and "degree of formality." *Id.* Consent applies to pre-removal/retention activity and may be shown by less "formal" types of evidence, *id.*, whereas acquiescence applies to post-removal/retention activity and generally requires more "formal" evidence such as a custody order or other "'convincing written renunciation of rights.'" *Nicolson*, 605 F.3d at 107 (citation omitted).

*Navani*, 496 F.3d at 1132 ("As the English family court retained jurisdiction at all times over [the child's] custody, and we have never had jurisdiction over the merits of the English family court's custodial decisions, we are powerless to alter the current custodial regime forbidding the very relief that [the appellant-respondent] seeks: return of the child to the United States.").

Applying these principles here leaves no doubt that Evelyn gave "'clear and unequivocal'" consent for the Texas court to make a final custody determination. *Nicolson*, 605 F.3d at 108 (alterations and citation omitted). Evelyn and Derek agreed to the Temporary Order because Derek's military service made a final resolution and trial impractical at the time. Not only did Evelyn answer the divorce lawsuit, but also she filed a counterpetition seeking affirmative relief.[15] Evelyn exercised custody—as a temporary joint managing conservator—under the Temporary Order until July 30, 2009, when the "final" divorce decree was entered at the suggestion of a Texas judge and as a compromise to forestall what was claimed to be K.L.'s imminent deportation. That decree was vacated weeks later by agreement of the parties. During Evelyn's time in the U.K., she recognized and obeyed orders entered by the Texas court on multiple occasions. Although Evelyn was sanctioned for discovery abuses and for failing to bring K.L. to the United States on one occasion, she ultimately paid the imposed sanctions and complied with all Texas court orders. She participated in the divorce trial, appealed the Final Decree, and later moved that the Texas court modify its terms based on her consistent

---

[15] Evelyn arguably waived any argument that the Texas court was an inappropriate forum to adjudicate the child custody issue by filing a counterpetition. In doing so, she did more than simply answer in order to avoid default; she affirmatively invoked the protection of the Texas court and its authority to provide her relief. *Cf. Nicholas v. KBR, Inc.*, 565 F.3d 904, 908-10 (5th Cir. 2009) (holding that a party waived arbitration rights by "substantially invoking the judicial process"); *City of Dallas v. Albert*, 354 S.W.3d 368, 374-75 (Tex. 2011) (holding that municipality lost immunity against certain claims by filing counterclaim).

obedience to the court's orders and submission to its jurisdiction. By her own admission, at no time did Evelyn initiate custody proceedings in the U.K.

Quite simply, the only thing in the record suggesting that Evelyn disagreed with the Texas court's authority is the filing of the instant action nine months after Final Decree was entered and almost a year after the divorce trial ended. *Cf. Baxter*, 423 F.3d at 367 ("The Convention is not designed to settle international custody disputes, but rather to ensure that cases are heard in the proper court." (citing Convention art. 19)). Although Evelyn—like most parents—was "'devastated'" to lose primary custody of her child, that fact cannot serve as evidence of nonconsent without undermining the Convention's ability "to deter parents from engaging in international forum shopping in custody cases." *Id.* (citation omitted). Accordingly, we hold that Derek proved as a matter of law that Evelyn agreed to the Texas court's final resolution of the custody issue.[16]

## V. K.L. "Habitually Resided" in the United States

Our conclusion that consent was given defeats Evelyn's claim of "wrongful retention." Even if this analysis is incorrect, however, we conclude that Evelyn failed to satisfy her burden on the elements necessary to establish wrongful retention. Because wrongful-retention analysis depends on first determining K.L.'s country of "habitual residence," we begin there. *See, e.g.*, *Mozes*, 239 F.3d at 1072 ("'Habitual residence' is the central—often outcome determinative—concept" under the Convention.).

"[A]lthough the term 'habitual residence' appears throughout the various Hague Conventions, none of them defines it." *Id.* at 1071 (footnote omitted). "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-

---

[16] Although we may not reflexively use the presence of the Final Decree as the "sole," dispositive fact, nothing precludes us from "tak[ing] account of the reasons for that [order] in applying [the] Convention." Convention art. 17.

intensive determination that necessarily varies with the circumstances of each case." *Whiting*, 391 F.3d at 546 (citation omitted).  At core, however, the inquiry balances the interests of the child, who is the ultimate focus of the Convention, and the intentions of its parents, who usually effect the removal or retention giving rise to a Convention petition.  *See, e.g.*, *Mozes*, 239 F.3d at 1072-73; Explanatory Report ¶¶ 57-58.

Courts use varying approaches to determine a child's habitual residence, each placing different emphasis on the weight given to the parents' intentions. At one end of the spectrum are those jurisdictions holding that a child's habitual residence cannot be changed without the clear agreement or acquiescence of the nonpossessory parent.  *See Mozes*, 239 F.3d at 1080-81 (discussing foreign authorities, including *Re S and another (minors)*, [1994] 1 All E.R. 237, 249 (Eng. Fam. Div.)).  The Sixth Circuit takes the opposite approach, placing paramount importance on the "child's experience," as established by the child's "acclimatization" and "degree of settled purpose," to the exclusion of the parents' "subjective intent."  *See Robert v. Tesson*, 507 F.3d 981, 989-95 (6th Cir. 2007).

We join the majority of circuits that "have adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence."  *Nicolson*, 605 F.3d at 104 & n.2 (collecting cases).  This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age.  For example, parents' intentions should be dispositive where, as here, the child is so young that "he or she cannot possibly decide the issue of residency."  *Whiting*, 391 F.3d at 548-49 (citing English case that looked to parents' intentions because the child was "two and one-half years old at the time of her abduction").

In such cases, the threshold test is whether both parents intended for the child to "abandon the [habitual residence] left behind."  *Mozes*, 239 F.3d at 1075; *see also Whiting*, 391 F.3d at 549-50.  Absent shared intent, "prior habitual

residence should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion." *Mozes*, 239 F.3d at 1082 (citation omitted). Notably, when "the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration[,] . . . most courts will find no change in habitual residence." *Whiting*, 391 F.3d at 549 (holding that a change in habitual residence had occurred because the parents had a written agreement that the child should reside in Canada, not New York, at the time the petition was filed); *see also Mozes*, 239 F.3d at 1077 & n.27 (collecting cases). Mere retention in another country and "private reservations" or intentions that are made "manifest and definitive" only after the child has left its country of origin are generally insufficient to establish intent to change a child's habitual residence. *Nicolson*, 605 F.3d at 104.

The district court concluded that the U.K. was K.L.'s habitual residence in March 2010 based on K.L.'s acclimation to the U.K. and Derek's intent that K.L. reside there with Evelyn during Derek's deployment. The district court relied primarily on Derek's agreeing to the Temporary Order provision giving Evelyn the right to determine K.L.'s residence without geographic restrictions and on his executing the Consent Affidavit allowing K.L. to reside in the U.K. The district court found that Evelyn and Derek's "last shared agreement . . . was that [K.L.] reside in the U.K. with his mother." We disagree.

As an initial matter, the district court's order did not consider several components of the habitual-residence inquiry. The order never analyzes the threshold question of whether Derek and Evelyn shared an intention that K.L. abandon the United States, which was indisputably his habitual residence before his arrival in the U.K. *See, e.g.*, *Whiting*, 391 F.3d at 548 (citing *Mozes*, 239 F.3d at 1075-76). Nor did the order address the fact that Evelyn never claimed before filing her petition that she intended for K.L. to permanently remain in the U.K. Derek, for his part, never intended for K.L. to "abandon" the United States for

23

any amount of time and, at most, agreed for K.L. to stay in the U.K. through resolution of the divorce proceedings. Thus, although Derek agreed that K.L. could remain in the U.K. for some time, no objective facts "unequivocally" show that the U.K. should "supplant[]" the United States as K.L.'s habitual residence. *Mozes*, 239 F.3d at 1082.

Regardless of the ties that K.L. unavoidably developed in the U.K., moreover, the above authorities demonstrate that his young age requires Derek and Evelyn's shared intentions be the primary focus in the habitual residence inquiry here. *See, e.g.*, *Whiting*, 391 F.3d at 549-50; *Mozes*, 239 F.3d at 1079 ("The question whether a child is in some sense 'settled' in its new environment is so vague as to allow findings of habitual residence based on virtually any indication that the child has generally adjusted to life there."). We therefore opt against following the Sixth Circuit's exclusively child-centered approach. To focus on a young child's experience encourages future "would-be abductor[s] to seek unilateral custody over a child in another country" or to delay returning to the child's original habitual residence as long as possible. *Mozes*, 239 F.3d at 1079 ("The greater the ease with which habitual residence may be shifted without the consent of both parents, the greater the incentive to try.").

Under the *de novo* review applicable to habitual residence determinations, *see Barzilay*, 600 F.3d at 916, we determine that the record establishes that K.L.'s presence in the U.K. was to last for a limited duration; that Derek never agreed to any other arrangement; and that no special circumstances justify departing from courts' general practice of finding no change in habitual residence in such cases. *See Whiting*, 391 F.3d at 549-50. We therefore conclude that Evelyn's sojourn did not alter K.L.'s habitual residence. As a result, we need not analyze any other element of the "wrongful-retention" analysis.

No. 11-50859

## Conclusion

We hold that this appeal is not moot; conclude that Derek satisfied his affirmative-defense burden under the Convention to show that Evelyn consented and acquiesced to the Texas court's authority to make a final custody adjudication; and find that K.L.'s habitual residence at the time of the alleged retention remained the United States. Accordingly, we VACATE the district court's order and RENDER judgment in Derek's favor. In light of the exigencies of this situation, we order that the mandate shall issue if no petition for panel rehearing or rehearing en banc is filed within seven days of the issuance of this opinion. *See* Fed. R. App. P. 35 & 40.