**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 15-41312

United States Court of Appeals
Fifth Circuit

**FILED**
September 19, 2016

Lyle W. Cayce
Clerk

RODRIGO LUIS DELGADO,

      Plaintiff - Appellant

v.

MARIANA CECILIA LUIS OSUNA,

      Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before WIENER, CLEMENT, and COSTA, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

In this Hague Convention case, Petitioner-Appellant Dr. Rodrigo Luis Delgado ("Dr. Delgado") appeals the district court's[1] denial of his petition for return of his children. For the following reasons, we AFFIRM.

**I.**

On May 22, 2015, Dr. Delgado filed a verified petition under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") for return of abducted children, seeking the return of his seven-

---

[1] By agreement, the parties consented to have the matter heard and resolved by the magistrate judge below. Because of this, we refer to the magistrate judge as the "district court" throughout this opinion.

No. 15-41312

year-old and four-year-old sons ("J.A.L.O." and "D.A.L.O," respectively, and referred to collectively herein as the "children") to Venezuela. The district court ordered the Respondent-Appellee, Mariana Cecilia Luis Osuna ("Osuna"), to show cause why the children should not be returned to Venezuela and why the relief requested by Dr. Delgado should not be granted. The district court conducted a show cause hearing and bench trial on the merits. The following findings of fact from the proceeding are relevant to this appeal.

Dr. Delgado is a dual citizen of Spain and Venezuela and is the biological father of the children in this case. Osuna is also a citizen of Venezuela and is the biological mother of the children in this case. Dr. Delgado and Osuna married in 2002. Dr. Delgado and Osuna have an apartment in Maracay, Venezuela, where they lived together from 2008 until May 2014. During this time, Dr. Delgado practiced urology, and Osuna was a stay-at-home mother.

J.A.L.O. was born in Maracay, Venezuela on July 17, 2008 and is a dual citizen of Spain and Venezuela. J.A.L.O. lived in Venezuela from his birth until May 2014, when he moved with his mother to Frisco, Texas. He has been enrolled in school in the Frisco Independent School District ("Frisco ISD") since approximately June 2014.

D.A.L.O. was born in Caracas, Venezuela on September 9, 2011 and is a dual citizen of Spain and Venezuela. He lived in Venezuela from his birth until May 2014, when he moved with his mother to Frisco.

Prior to traveling to the United States in May 2014, Dr. Delgado and Osuna frequently discussed the civil unrest and danger occurring in Venezuela, and they discussed relocating their family to another country. The possible new countries of residence included the United States, Spain, Panama, and Ecuador, among others. The discussions were motivated by fear for their family, especially the children, after the family was robbed in 2013 in a Venezuelan hotel room while they slept. Additionally, Osuna testified that

2

her family, specifically her uncle and father, had been involved in a military coup to overthrow the Venezuelan government. As a result, she and other members of her family had been threatened by the government, and she believed that her children had also been threatened. Specifically, Osuna testified that she believed her children were threatened on March 4, 2014, when she was asked to pass a message to her uncle and father to "stop messing with the government."  At the conclusion of the conversation, the men who threatened her said, "Okay, you have a beautiful blondies [children], then take care."[2]

The family had previously planned to travel to the United States on May 14, 2014 so that Dr. Delgado could attend the annual Congress of Urology and the children could visit amusement parks. The family obtained six-month tourist visas for the visit. Originally, the family purchased four round-trip tickets arriving in Miami on May 14, 2014 and departing Miami to return to Venezuela on May 26, 2014. Following the March threat to Osuna, one-way tickets were also purchased (sometime between March and May 2014) for Osuna and both children to travel to Osuna's sister's home in Frisco, for an undetermined period of time.

Also after the March 2014 threat, Osuna withdrew J.A.L.O. from school in Venezuela, and with Dr. Delgado's knowledge and approval, she sent J.A.L.O.'s paperwork to the school in Frisco to prepare for his enrollment upon their arrival. The family packed as many belongings as they could fit inside eight suitcases (two per person), which was the maximum allowed by the airline before it charged a fee. Osuna brought all of her and her children's

---

[2] The parties experienced additional acts of violence in Venezuela. Dr. Delgado, one of his sons, and his mother-in-law were robbed at gunpoint in front of the marital home. And a person was assassinated in the lobby of the hospital where Dr. Delgado worked.

important documents, including birth certificates, medical records, school records, and her marriage license. Osuna and Dr. Delgado also went to Osuna's mother's house to pick out jewelry to bring to the United States. She recalled telling her husband that they were looking "just like Jews . . . trying to run out from Germany. We are taking all the jewels and all the gold that we can collect and put inside to go out from Venezuela." Dr. Delgado also established a bank account in Frisco prior to the trip and deposited money into it.

On May 14, 2014, the family traveled to Miami, Florida. During this trip, Osuna and Dr. Delgado met with Maritza Cifuentes ("Cifuentes"), who assisted Osuna and the children with preparing their applications for political asylum in the United States. During the meeting, Dr. Delgado learned that in order to practice urology in the United States, he would have to undergo an additional fourteen years of medical school and/or training. Accordingly, Dr. Delgado decided not to pursue asylum in the United States. On May 25, 2014, Osuna and the children flew to Texas. Dr. Delgado returned to Venezuela one day later. He did not return to the United States until the hearing before the district court.

Dr. Delgado testified that he intended for Osuna and the children to return to Venezuela sometime after the expiration of the six-month visas, but he had no specific time frame in mind. Osuna testified that she did not intend to ever return to Venezuela but that she discussed reuniting the family with Dr. Delgado in Spain if he was able to find a job there. Dr. Delgado testified that he was aware of the asylum applications but that he did not consent to or intend for Osuna and the children to live in the United States without him permanently.

Dr. Delgado testified that the family left behind ninety percent of their personal belongings in Venezuela. They did not sell their apartment and only took the clothing and other items that they could fit in the suitcases allowed

by the airline. Dr. Delgado did not attempt to sell his medical practice. He did, however, later sell one of the family's two cars in Venezuela to pay some outstanding loans and send money to Osuna and the children in the United States.

Throughout the spring and summer of 2014, Osuna and the children resided in Frisco, and J.A.L.O. enrolled in school there. On July 9, 2014, Dr. Delgado signed a power of attorney giving Osuna the authority to make decisions regarding medical, educational, and other care for the children while in the United States. Both parties agreed that the power of attorney did not affect either parties' custody rights. Yet, the parties' testimony diverged concerning the reason for executing the power of attorney. Dr. Delgado testified that the power of attorney was intended to give Osuna the authority to make medical, educational, and other care-related decisions for the children while they were in the United States. Osuna testified that the power of attorney was executed so that she could pursue the asylum applications for the children.

In the fall of 2014, Dr. Delgado packed and sent, through a family member, some winter clothes to Osuna and the children. Osuna testified that even as late as October 2014, Dr. Delgado was aware of the asylum applications and continued to support her in pursuing asylum. Dr. Delgado provided approximately $500 a month to Osuna and the children until December 2014, when he ceased making these payments. Dr. Delgado testified that he requested that Osuna and the children return home in September 2014 because the political situation in Venezuela was improving. She refused. Dr. Delgado testified that his relationship with his wife had deteriorated, and he filed for divorce in January 2015.

* * *

At the conclusion of the hearing, the district court orally denied Dr. Delgado's petition. Later, the district court issued a written opinion finding

that Dr. Delgado "failed to meet his burden to establish by a preponderance of the evidence that the habitual residence of the children was Venezuela, and, thus, failed to demonstrate that the children were wrongfully removed and/or retained in the United States." Additionally, the district court held that even if it erred in its determination that Dr. Delgado failed to establish Venezuela as the children's habitual residence, "this error is harmless as the Court finds the consent exception to return applies here." The district court entered judgment dismissing the petition with prejudice. Dr. Delgado appealed.

## II.

"Resolving disputes under the Convention implicates multiple standards of review." *Larbie v. Larbie*, 690 F.3d 295, 306 (5th Cir. 2012). "[T]his court reviews factual findings for clear error and conclusions of law *de novo*." *Id.* "A factual finding survives review so long as it is plausible in the light of the record as a whole." *Id.* (internal quotation marks omitted). A district court's determination of a child's "habitual residence" is a mixed question of law and fact subject to *de novo* review. *Id.* "The mixed standard of review means that the court accept[s] the district court's historical or narrative facts unless they are clearly erroneous, but exercis[es] plenary review of the court's choice of and interpretation of legal precepts and its application of those precepts to the facts." *Berezowsky v. Ojeda*, 765 F.3d 456, 465-66 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1531 (2015) (internal quotation marks omitted).

## III.

Dr. Delgado argues that "the district court ignored Fifth Circuit precedent and applied an erroneous legal standard in its determination of the Children's habitual residence" and that the factual "record does not support the district court's finding that the parties shared an intent to abandon Venezuela as the Children's habitual residence."

No. 15-41312

The Convention has two primary objectives: "(1) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Larbie*, 690 F.3d at 306 (internal quotation marks omitted). A court in a Convention case does not inquire into the underlying custody dispute. *See Berezowsky*, 765 F.3d at 465. "Rather, our inquiry is limited to determining whether or not the child has been wrongfully removed from their country of 'habitual residence.'" *Id.*

> A removal or retention is wrongful under the Convention when (1) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and (2) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Larbie*, 690 F.3d at 307 (internal quotation marks omitted). For the petitioner to prevail, he must establish three elements by a preponderance of the evidence: (1) that the respondent removed or retained the child somewhere other than the child's habitual residence; (2) that the removal or retention violated the petitioner's rights of custody under the habitual-residence nation's laws; and (3) that at the time of removal or retention, petitioner was exercising those rights or would have exercised those rights but for the removal or retention. *Id.* Even if a petitioner establishes the foregoing, a court may still deny a petition if the respondent proves one of several narrow affirmative defenses to wrongful removal or retention. *Id.* at 308.

*A. Challenged Holding as to the Children's Habitual Residence*

Dr. Delgado argues that he satisfies the first element of his wrongful removal claim because Osuna wrongfully removed and retained their children

7

outside of their habitual residence—Venezuela—and moved them to the United States. The Convention does not define "habitual residence." *Larbie*, 690 F.3d at 310. "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id* (internal quotation marks omitted). This circuit has

> adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence. . . . This approach does not ignore the child's experience, but rather gives greater weight to the parents' subjective intentions relative to the child's age. For example, parents' intentions should be dispositive where, as here, the child is so young that he or she cannot possibly decide the issue of residency.

*Id.* (internal quotation marks and citations omitted). "[T]he threshold test is whether both parents intended for the child to abandon the [habitual residence] left behind."[3] *Id.* at 310-11 (internal quotation marks omitted). Absent the parents' shared intent, "prior habitual residence should be deemed supplanted only where 'the objective facts point unequivocally' to this conclusion." *Id.* at 311. "Notably, when 'the child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration[,] . . . most courts will find no change in habitual residence.'" *Id.*

This court reviews a district court's shared intent determination for clear error. *See Berezowsky*, 765 F.3d at 466 n.7 ("[W]e join our sister circuits in

---

[3] "As multiple courts have noted, the difficult cases arise when the persons entitled to fix the child's residence do not agree on where it has been fixed. Much of the existing case law discussing a child's habitual residence involves situations where the parents were still together at the time of the child's birth, made plans for the child's future, and only later did the family unit begin to dissolve. In these situations, the court's task is usually to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed." *Berezowksy*, 765 F.3d at 468 (internal quotation marks and citations omitted).

treating the shared intent determination as a factual finding that is reviewed for clear error."). Here, the district court found that the parties' "last shared intent . . . regarding their children's future was that they would leave their habitual residence, Venezuela, and would not return." The district court recognized that the parties' shared intent eventually diverged but that after meeting with Cifuentes in the United States, the last shared intent was for Osuna and the children to seek political asylum in the United States and for Dr. Delgado to return to Venezuela to seek employment opportunities elsewhere. If Dr. Delgado was successful in finding employment outside of Venezuela, Osuna and the children would cancel their asylum applications and reunite with Dr. Delgado.

Dr. Delgado argues that he and Osuna did not form a shared intent to abandon Venezuela as the children's habitual residence. Because the plan was laden with contingencies and did not foreclose a return to Venezuela, Dr. Delgado contends that there was not the requisite shared intent to change the habitual residence of the children. He argues that the district court ignored this court's rejection of a similar argument in *Berezowksy,* 765 F.3d at 471.

Dr. Delgado's arguments fall short. The district court did not clearly err in its shared intent determination. The record demonstrates that Osuna and Dr. Delgado's last shared intent was to abandon Venezuela permanently as the children's habitual residence. There was a meeting of their minds to abandon Venezuela as the children's habitual residence. *See Larbie*, 690 F.3d at 310-11 (requiring a meeting of the parents' minds to abandon the children's habitual residence). Once Osuna and Dr. Delgado formed this shared intent and the children subsequently left Venezuela with their most important documents in tow, Venezuela was abandoned as the children's habitual residence.

Dr. Delgado's argument—that the shared intent to abandon a child's habitual residence requires "making a joint decision to raise the child in the

new country" *and* that the new country must be agreed upon by the parents—is not the law in this circuit. *Berezowsky*, 765 F.3d at 471 (emphasis omitted). In *Berezowsky*, two Mexican nationals were engaged in a bitter custody battle over their child in Mexican and United States courts. *Id.* at 459. The fighting and procedural wrangling resulted in the child changing hands among the parents many times and moving between Mexico and the United States many times. *Id.* The child was born in Texas and spent the first two years of his life there with his mother. *Id.* at 459-60. The father filed a petition under the Convention in Texas to return the child to Mexico, but the Texas court denied his petition and found that it had jurisdiction over his fight for custody. *Id.* at 460. The father was awarded custody in the Texas state proceeding and thereafter moved the child to Mexico. *Id.* at 461. While in Mexico, the parents filed or continued actions in seven Mexican courts. *Id.* The mother regained possession of the child, and the father continued to fight for the child in Mexican and Texas courts. *Id.* at 461-62. Following an award of sole custody in Texas and a victory in Mexico in which the Mexican authorities gave the child back to the father, the father moved with the child to Texas. *Id.* at 463-64. Ultimately, the mother filed a petition under the Convention, alleging wrongful removal of the child from Mexico to Texas. *Id.*

In an attempt to establish Mexico as the child's habitual residence, the mother argued that both parents decided individually to abandon Texas as the child's habitual residence and decided individually to establish the child's new residence in Mexico and that this sufficed for shared parental intent. *Id.* at 471. She based this argument on the fact that the child's father had moved the child to Mexico from Texas after winning custody and that she subsequently stayed in Mexico with her son for thirteen months after getting the child back. *Id.* This court rejected the mother's argument. *Id.* It stated that "[the mother] does not point to any case law supporting her novel argument that parents can

form the *shared intent* necessary to abandon a prior habitual residence without—at some point in the child's life—making a *joint decision* to raise the child in the new country." *Id.*

Dr. Delgado relies on this language to support his position that parents must agree on "*the* new country of residence," and not on an unspecified country to be determined at a later time in order to abandon a child's habitual residence. But the argument rejected in *Berezowsky* is highly distinguishable from the situation here. *Berezowsky* involved a bitter custody dispute where the child was moved back and forth between the United States and Mexico largely because the parents sought more favorable forums for their custody dispute. The parents did not share an intent concerning the location of their child's habitual residence, and this court rejected the mother's argument that a shared intent could be established by the parents individually. Here, in contrast, the parents held a shared intent for their children to abandon Venezuela. Thus, Dr. Delgado's reliance on *Berezowsky* is misplaced. Simply because the *Berezowsky* court used the term "the new country" as opposed to "a new country" does not inform our analysis here for an entirely different argument.

The district court applied the correct legal standard in determining the children's habitual residence, and its shared intent determination was not clearly erroneous.

*B. Challenged Factual Findings*

Dr. Delgado challenges a number of the district court's factual findings that underpin its decision to deny his petition. Specifically, Dr. Delgado challenges the findings: that "[u]pon arrival in the United States, [Dr. Delgado] and [Osuna] would seek political asylum for themselves and the children, while residing in the United States with the children"; that there was no evidence that the family expected the trip to be of limited duration; and that the family

intended to abandon Venezuela with no intent to return. Dr. Delgado contends that these factual findings are "wholly unsupported by the record."

Dr. Delgado faces a difficult task trying to show that any of the district court's factual findings were clearly erroneous. *See Larbie*, 690 F.3d at 306 ("A factual finding survives review so long as it is plausible in the light of the record as a whole." (internal quotation marks omitted)). In challenging the finding concerning seeking political asylum, Dr. Delgado argues that no evidence supports him ever intending to apply for asylum in the United States. We disagree. There is at least some evidence that supports this finding, namely that he attended the meeting with Cifuentes where he learned that he would be unable to practice medicine in the United States without multiple years of additional schooling and training. Regardless, Dr. Delgado's intentions concerning his seeking political asylum are largely irrelevant for purposes of his petition. The important finding is that Dr. Delgado and Osuna agreed that she would seek political asylum for the children because this finding establishes the conclusion that Osuna and Dr. Delgado intended to abandon Venezuela as the children's habitual residence. The record supports this finding. Thus, the relevant finding by the district court is not clearly erroneous.

Dr. Delgado's challenge to the district court's finding that there was *no evidence* that the family expected the trip to the United States to be of limited duration has merit. This finding is not plausible in light of the record as a whole because there is at least some evidence that the trip to the United States was expected to be of limited duration. Osuna testified that she emailed Dr. Delgado expressing her plan to stay in the United States until Dr. Delgado obtained a job in Spain, whereupon she would cancel their asylum applications and move the family to meet him there. The family's decision to leave ninety percent of their belongings behind in Venezuela and to forgo trying to sell all of their assets before the relocation is additional evidence of the trip to the

United States being temporary. Even though the district court clearly erred by making this finding, this error is harmless because it has no effect on our resolution of this appeal.

Evidence that Dr. Delgado and Osuna planned for Osuna and the children to stay in the United States only until Dr. Delgado secured a job in Spain does not change the fact that Dr. Delgado and Osuna held a shared intent for the children to abandon Venezuela permanently. In other words, the stay in the United States was initially planned to be temporary, but the intention for the children to abandon Venezuela was permanent. Thus, Dr. Delgado's contention that the district court clearly erred by finding that the family intended to abandon Venezuela as the children's habitual residence with no intent to return is without merit. This finding is plausible in light of the record.

Osuna traveled to the United States with all of her and her children's most important documents—birth certificates, medical records, school records, and a marriage license—and she packed portable valuables like jewelry before leaving. She arranged for J.A.L.O. to attend school in Frisco before leaving for the United States. The move was prompted by increasing violence and instability in Venezuela and out of fear for Osuna and the children's safety. Members of Osuna's family had already left Venezuela, and Osuna diligently applied for asylum for her and her children so that they would not have to return to Venezuela. Dr. Delgado's actions demonstrate that he agreed that the children should permanently abandon Venezuela. Even the fact that the family did not sell their most valuable assets—their home, two cars, and Dr. Delgado's medical practice—does not call into question the finding that the parents held a shared intent to abandon Venezuela permanently as the children's habitual residence. When placed in context of the family's most recent shared plan—for Osuna and the children to move to the United States

13

No. 15-41312

while Dr. Delgado obtained a job in Spain and then for the family to meet him there—it is plausible that the family could have sold these valuable assets after Dr. Delgado obtained employment in Spain. Sadly, Osuna and Dr. Delgado's last shared plan did not work out, and the family broke apart. Nevertheless, the district court's factual findings that underpin its conclusion that Osuna and Dr. Delgado held a shared intent to abandon Venezuela as the children's habitual residence are supported by the record.

Dr. Delgado cannot meet his burden to show that the children were wrongfully removed from Venezuela or retained in the United States because Venezuela was abandoned as the children's habitual residence.[4] Thus, the district court correctly held that Dr. Delgado's petition failed. Because his petition fails, we need not reach the district court's alternate holding.

**IV.**

For the foregoing reasons, we AFFIRM.

---

[4] We need not decide if and when the children established a new habitual residence in the United States or if the children had no habitual residence for a period of time because those issues are immaterial to the resolution of this petition.