**Yolanda Sanchez TAVAREZ,**
**Petitioner,**

v.

**Michael JARRETT, Respondent.**

**Civil Action No. H–16–2978**

United States District Court,
S.D. Texas, Houston Division.

Signed 05/16/2017

---

**632**

Ashley V. Tomlinson, Laura Dale Associates, Houston, TX, for Petitioner.

Adam M Helleck, Attorney at Law, Houston, TX, for Defendant.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

DAVID HITTNER, United States District Judge

On April 26, 2017, this Court commenced a non-jury trial in the above-entitled matter, during which the Court received evidence and heard sworn testimony. Having considered the evidence, testimony, and oral arguments presented during trial, along with post-trial sub-

1. Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 1988 WL 411501, *reprinted in* 51 Fed. Reg. 10,494 (March 26, 1986).

2. International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.*

missions and the applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

### I. BACKGROUND

This case involves the wrongful removal of a child pursuant to the Hague Convention (the "Convention")[1] and the International Child Abduction Remedies Act ("ICARA").[2] Petitioner Yolanda Sanchez Tavarez ("Petitioner") alleges Respondent Michael Jarrett ("Respondent") wrongfully removed their six-year-old daughter, BLSJ, from Mexico to the United States on January 24, 2016. Petitioner filed suit in this Court on October 4, 2016, asking the Court to order the return of BLSJ to her "habitual residence" of Mexico. Respondent contends Petitioner consented or acquiesced to the relocation of BLSJ to the United States. Respondent also contends Mexico poses a grave risk of harm to BLSJ due to inadequate medical care, a risk of disease, a high rate of criminal activity, and abuse.

### II. FINDINGS OF FACT[3]

The following facts have been established by a preponderance of the evidence:

1. Petitioner is a Mexican national and Respondent is an American national.

3. Unless otherwise noted, the findings of fact contained herein are based on the testimony and other evidence presented at the April 26, 2017 trial.

2. Petitioner has been employed as a high school computer software teacher for eleven years. Respondent is retired.

3. The parties never formally married but lived in the same residence in Lagos de Moreno, Jalisco, Mexico from 2009 until their separation in 2014. There is no order from a Mexican court pertaining to parental rights, custody, or conservatorship with regard to BLSJ.

4. The parties are the parents of one six-year-old child, BLSJ.

5. BLSJ was born in Lagos de Moreno, Jalisco, Mexico on June 13, 2010. BLSJ resided in Mexico until she was removed to the United States on January 24, 2016.

6. Petitioner also has two other teenage children from a prior relationship.

7. Upon separation, the parties shared custody of and caretaking responsibilities for BLSJ while continuing to reside in Lagos de Moreno, Jalisco, Mexico. At that time, Petitioner resided in her parents' home, and Respondent continued to reside in the parties' former home.

8. Respondent concedes that Mexico was the country of BLSJ's habitual residence.

9. From the time of the parties' separation until BLSJ's removal to the United States, Petitioner had possession of the child every weekday from approximately 2 p.m. until 9 or 10 p.m., every weekend, and for multiple approximately week-long periods when Respondent traveled to the United States.

10. On May 10, 2012, BLSJ was hospitalized in Mexico after suffering seizures and fainting. At that time, BLSJ was transferred to a hospital in Guadalajara, Mexico (the "Guadalajara Hospital").

11. BLSJ was subsequently diagnosed with anti-NMDA encephalitis ("Anti-NMDA"), an autoimmune disease.

12. BLSJ was placed in a medically induced coma and required feeding and breathing tubes.

13. BLSJ does not have viral encephalitis.

14. BLSJ received immunoglobulin treatment and other treatments for Anti-NMDA while at the Guadalajara Hospital.

15. BLSJ was released from the Guadalajara Hospital in November 2013 and thereafter received continuing medical treatments, physical therapy, and speech therapy.

16. Dr. Margarita Gonzalez Cruz ("Dr. Cruz")[4] served as BLSJ's treating pediatric neurologist at the Guadalajara Hospital.

17. Both parents regularly attended BLSJ's medical appointments with Dr. Cruz in Guadalajara, Mexico.

18. Dr. Cruz frequently treats patients diagnosed with Anti-NMDA. The Guadalajara Hospital has the experience and facilities to treat BLSJ's Anti-NMDA.

19. Dr. Cruz does not have any concerns about BLSJ's ability to receive the appropriate medical treatment in Mexico.

20. Dr. Cruz obtained a background and history from the parents, and neither parent reported any information to Dr. Cruz that would cause her to be concerned about BLSJ's living conditions in Mexico or their effects on BLSJ's health.

21. At the time of BLSJ's last appointment in Mexico, on November 20, 2015, BLSJ's disorder was stable and controlled, and Dr. Cruz believed BLSJ would likely go into remission.

22. On January 24, 2016, Respondent removed BLSJ from Mexico and brought her to the United States. The same day, Petitioner went to Respondent's residence

**4.** Dr. Cruz testified at trial from Mexico via telephone.

in Mexico to retrieve BLSJ, but Respondent's home was empty and his vehicle was gone.

23. Respondent testified that he and Petitioner agreed BLSJ should move to the United States to seek medical treatment for BLSJ's Anti–NMDA.

24. Neither parent ever spoke to Dr. Cruz about the possibility of transferring BLSJ to the United States. Respondent did not bring BLSJ's medical records to the United States. Petitioner never told her aunt, Maria Loreto Tavarez Reyes ("Loreto"),[5] that Petitioner agreed to Respondent taking BLSJ to the United States. Petitioner never told her mother, Maria de Los Angeles Tavarez Reyes ("Angeles"),[6] that Petitioner agreed to Respondent taking BLSJ to the United States. Respondent told BLSJ's uncle (Respondent's witness), Fredy Garcia ("Garcia"),[7] that Respondent was considering bringing BLSJ to the United States, but Garcia was not aware of an agreement between Petitioner and Respondent to do so.

25. On January 25, 2016, Petitioner sent Respondent a text message stating, "I hope you aren't mean to take [BLSJ] away from her mother and her family. You know that she love us and she us suffering. I never hurt her in my life."[8] Respondent did not respond. On February 3, 2016, Petitioner sent Respondent another text message stating "May god take care of you my [BLSJ], you are not at fault for any-

thing and you are suffering from the wrong decisions."[9] Respondent did not respond.

26. Petitioner did not have any knowledge of Respondent's plans to leave with BLSJ on January 24, 2016.

27. Petitioner did not agree to Respondent removing BLSJ from Mexico.

28. Petitioner did not execute any document giving Respondent permission to remain in the United States with BLSJ.

29. On March 31, 2016, Petitioner filed an application for return under the Hague Convention with the Central Authority in Mexico (the Ministry of Foreign Affairs), seeking to have BLSJ returned to Mexico.[10] The Central Authority in Mexico informed Petitioner that BLSJ had crossed the Mexican–American border into the United States.

30. Upon removing BLSJ to the United States, Respondent and BLSJ resided in Houston, Texas.

31. Respondent did not inform Petitioner of Respondent's address in Houston, Texas.

32. In May 2016, Petitioner contacted the Texas Department of Family and Protective Services ("DFPS") because she was concerned about whether BLSJ was receiving medical treatment in the United States.

---

5. Loreto testified at trial from Mexico via video.

6. Angeles testified at trial from Mexico via telephone.

7. Garcia testified at trial from Mexico via telephone

8. *Petitioner's Exhibits*, Exhibit 20 (*January, February, and May 2016 Text Messages*) [hereinafter *January, February, and May 2016 Text Messages*].

9. *See January, February, and May 2016 Text Messages, supra* note 8. The February 3, 2016 text message was written in Spanish, but at trial, the message was translated to English. The English translation was not objected to and is quoted above.

10. *Petitioner' Exhibits*, Exhibit 1 (*Hague Application*).

33. On May 10, 2016, Respondent told a DFPS employee that "he alone has always been the only provider for [BLSJ]" and that Petitioner "has never been a part of the child's life and does not attend doctor visits."[11] Respondent also told the DFPS employee that "he currently does not have custody of [BLSJ]. . . ."[12]

34. On May 18, 2016, Petitioner sent Respondent a text message asking to communicate with BLSJ via skype.[13] Respondent did not respond.

35. The same day, Petitioner told a DFPS employee that he would "no longer be taking his daughter . . . [BLSJ] back to Mexico."[14] Respondent also told the DFPS employee that "he only considered taking [BLSJ] back because of her treatments but she is able to work with her doctors here in Houston to receive them."[15]

36. On May 24, 2016, Respondent brought BLSJ to Texas Children's Hospital in Houston, Texas (the "Houston Hospital").[16] This was BLSJ's first medical treatment for Anti–NMDA since the January 24, 2016 removal. At that appointment, Respondent told a Houston Hospital doctor that he moved BLSJ from Mexico in February 2016 to get away from Petitioner.[17] Respondent also stated that he wanted BLSJ to receive medical treatment in the United States and that Petitioner was physically abusing BLSJ.[18]

37. On August 2, 2016, Petitioner sent Respondent a text message stating, "Don't let nothing wrong happen to [BLSJ], If she cannot get the treatment what she needs there, you need to bring her here."[19] The same day, Respondent responded stating, "She is OK but she needs to get treatment it's time it's been long time can't wait for her to get bad need to do it before it happens."[20]

38. Dr. Cruz reviewed the Houston Hospital's medical records. The Houston Hospital did not administer any new treatments to BLSJ for her encephalitis but took BLSJ off of two medications BLSJ had previously been on (Rituximab and Clonzapam). The Houston Hospital kept all of BLSJ's other medications at the same dosage.

39. On November 11, 2016, a Houston Hospital doctor indicated that there is a possibility BLSJ could have a chromosomal abnormality disorder incidental to her encephalitis that may be causing microcephaly. Dr. Cruz disagreed, testifying that chromosomal disorders and genetic microcephaly would be present since birth and would not arise suddenly. BLSJ did not have any chromosomal disorders at birth or before her diagnosis with Anti–NMDA. Dr. Cruz also testified that there is no medical treatment for a genetic or chromosomal disorder. The Houston Hospital did not conduct any genetic testing to

**11.** *Respondent's Exhibits*, Exhibit 12 at 11 (*DFPS Investigation Report*) [hereinafter *DFPS Investigation Report*].

**12.** *DFPS Investigation Report, supra* note 11, at 11.

**13.** *January, February, and May 2016 Text Messages, supra* note 8.

**14.** *DFPS Investigation Report, supra* note 11, at 13.

**15.** *DFPS Investigation Report, supra* note 11, at 13.

**16.** *Plaintiff's Exhibits*, Exhibit 23 (*Texas Children's Hospital Visit Summaries*).

**17.** *Respondent's Exhibits*, Exhibit 1 at 17 (*Texas Children's Hospital Doctor's Report*) [hereinafter *Texas Doctor's Reports*].

**18.** *Texas Doctor's Reports, supra* note 17, at 17.

**19.** *Petitioner's Exhibits*, Exhibit 21 (*August 2016 Text Messages*).

**20.** *Petitioner's Exhibits*, Exhibit 22 (*August 2016 Text Messages*).

confirm whether BLSJ has a chromosomal abnormality. The Guadalajara Hospital is capable of conducting genetic testing.

40. Between August and November 2016, Petitioner and Respondent exchanged multiple text messages.[21] Throughout this correspondence, Petitioner repeatedly expressed a desire to be with BLSJ.[22] Petitioner also expressed a desire to reconcile with Respondent.[23]

41. On November 15, 2016, Respondent sent Petitioner a text message stating, "She has to see two more doctors remember I told you." [24] Petitioner responded, stating, "Yes, and I don't know what It's going to be at the end, but for me It's not the end of the world And I would like Breanna live with her family." [25] Respondent responded, stating, "SO what happened to all you say about coming here to be with us and get married." [26] Petitioner responded, stating, "I'm in the same position, but It's up to you." [27]

42. Respondent testified that he had to remove BLSJ from Mexico because Petitioner was allegedly abusing BLSJ.

43. Respondent testified that, at different times, he noticed marks on BLSJ's chin, cuts on her nose and forehead, and a laceration across BLSJ's stomach. Respondent testified that he believes the laceration happened while Respondent was previously in the United States and BLSJ was staying with Petitioner. On May 10, 2016, Respondent told a DFPS employee that BLSJ "has a scar on [her] stomach because she had surgery when her heart stopped." [28]

44. Petitioner denies ever physically abusing BLSJ.

45. Garcia has never witnessed any abuse and does not have any concerns about Petitioner's care for BLSJ. Angeles, whom Petitioner lives with, has never witnessed Petitioner or any member of Petitioner's family abuse BLSJ. Neither parent has ever reported abuse to Dr. Cruz. Dr. Cruz has never seen any signs of abuse during her examinations of BLSJ.

46. Respondent testified that he has Post Traumatic Stress Disorder. On May 10, 2016, Respondent told a DFPS employee that he has never been diagnosed with any mental health disorders.[29]

47. When questioned about Respondent's statements to the DFPS employee, Respondent testified he believed the DFPS employee who reported the statements confused Respondent's words with Petitioner's.

## III. CONCLUSIONS OF LAW

### A. The Hague Convention and ICARA

1. The Convention on the Civil Aspects of International Child Abduction governs civil proceedings filed in signatory countries for the recovery of abducted children. The United States and Mexico are signato-

21. *Respondent's* Exhibits, Exhibit 10 at 1–33 (*August—November 2016 Text Messages*) [hereinafter *August—November 2016 Text Messages*].

22. *August—November 2016 Text Messages, supra* note 21, at 24, 27, 32, 33.

23. *August—November 2016 Text Messages, supra* note 21, at 3–8, 14–17, 24, 29–31.

24. *August—November 2016 Text Messages, supra* note 21, at 1.

25. *August—November 2016 Text Messages, supra* note 21, at 1.

26. *August—November 2016 Text Messages, supra* note 21, at 1–2.

27. *August—November 2016 Text Messages, supra* note 21, at 1–2.

28. *DFPS Investigation Report, supra* note 11, at 11.

29. *DFPS Investigation Report, supra* note 11, at 11.

ries to the Convention. ICARA, 22 U.S.C. § 9003 *et seq.*, establishes the procedures for the implementation of the Convention.

2. The Convention and ICARA empower courts to order the return of children removed from their country of habitual residence, not to determine the merits of an underlying custody dispute. 22 U.S.C. § 9001(b); *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000). The Convention requires that a court order the return of a wrongfully removed or retained child.

3. The removal or retention of a child is wrongful if the petitioner proves by a preponderance of the evidence the following: (1) the child was removed from the child's country of habitual residence; (2) the removal was in breach of petitioner's rights of custody under the laws of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of removal. Hague Convention, arts. 3, 12.

4. Upon a finding of wrongful removal or retention, the court has the discretion to refuse to order the return of the child if the left-behind parent consented or subsequently acquiesced to the removal. Hague Convention, art. 13(a).

5. The Court also has the discretion to refuse to order the return of the child if there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b).

### B. Wrongful Removal

6. Petitioner contends Respondent wrongfully removed BLSJ from Mexico.

#### a. Habitual Residence

7. To meet the first element of wrongful removal, Petitioner must show by a preponderance of the evidence that Mexico was the country of BLSJ's habitual residence at the time of BLSJ's removal.

■ 8. Habitual residence is a mixed question of law and fact. *Berezowsky v. Ojeda*, 765 F.3d 456, 466 (5th Cir. 2014).

9. It is uncontested that BLSJ was habitually residing in Lagos de Moreno, Jalisco, Mexico at the time of removal.

10. A preponderance of the evidence establishes that Mexico was BLSJ's habitual residence at the time of removal.

### B. Breach of Rights of Custody

■ 11. In addition to proving Mexico was the country of BLSJ's habitual residence, Petitioner must prove BLSJ's removal was in breach of Petitioner's rights of custody under Mexican law.

■ 12. " 'Rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5. The rights of custody may be held either jointly or alone under the law of the country in which the child was habitually residing immediately before the removal or retention. Hague Convention, art. 3. The Convention does not require a formal custody decree; rights of custody exist by mere operation of law. Hague Convention, art. 3. The term "rights of custody" is to be broadly interpreted so as to bring as many cases as possible under the purview of the Convention. *Abbott v. Abbott*, 560 U.S. 1, 22, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010).

13. Because the Court has found that BLSJ was habitually residing in Lagos de Moreno, Jalisco, Mexico immediately before her removal, the rights of custody will be determined by the application of the laws of the Republic of Mexico. *See Bernal v. Gonzalez*, 923 F.Supp.2d 907, 918 (W.D. Tex. 2012) (Counts, Mag.).

14. The Consulate General of Houston for the Mexican Ministry of Foreign Af-

fairs has provided copies of the Civil Code of Jalisco ("Civil Code").

15. Article 581 of the Civil Code grants parental rights to both parents.[30]

16. Thus, the state of Jalisco, Mexico, in accordance with the Civil Code, adheres to the legal doctrine of *patria potestad* (meaning "parental rights"), under which "both parents have joint custody rights." *Saldivar v. Rodela,* 879 F.Supp.2d 610, 623–24 (W.D. Tex. 2012) (Guaderrama, J.) (providing a comprehensive discussion of *patria potestad* and the rights attributable to parents under the doctrine).

17. Under Article 580 of the Civil Code, parental rights include the "right, duty and responsibility to care for … [and] raise … the child."[31]

18. Under Article 586 of the Civil Code, a child must live in the same place as a parent who has parental rights and cannot leave his or her home without the permission of the other parent or a court order.[32]

■ 19. A *ne exeat* right is the right of a parent to decide whether a child can leave the country. *Abbott,* 560 U.S. at 9–13, 130 S.Ct. 1983. Under this right, one parent cannot remove a child from the country without the permission of the other parent or a court order. *Id.* A *ne exeat* right constitutes a right of custody within the meaning of the Convention. *Id.* at 16, 130 S.Ct. 1983.

20. Petitioner has rights of custody under Mexican law, including rights relating to the care of BLSJ and a *ne exeat* right to give permission before the child can be removed from the country.

■ 21. A preponderance of the evidence establishes Respondent breached Petitioner's rights of custody to BLSJ when Respondent removed BLSJ from Mexico on January 24, 2016.

### c. *Exercise of Rights of Custody*

22. Finally, for BLSJ's removal to have been wrongful, Petitioner must show that Petitioner was, or otherwise would have been, exercising rights of custody to BLSJ under Mexican law at the time of removal.

23. The Convention and ICARA do not define what constitutes an "exercise" of rights of custody. Courts have interpreted the word "exercise" broadly and in its simplest, ordinary meaning. *Sealed Appellant v. Sealed Appellee,* 394 F.3d 338, 343–45 (5th Cir. 2004). Even occasional contact with the child constitutes exercise of custody rights. *Id.*

24. It is undisputed that at the time Respondent removed BLSJ to the United States, Petitioner was exercising her rights of custody at least five days a week.

25. A preponderance of the evidence establishes Petitioner was exercising her rights of custody at the time of BLSJ's removal.

26. Accordingly, the Court finds that a preponderance of the evidence establishes Respondent wrongfully removed BLSJ from Mexico.

### C. *Defenses to Wrongful Removal*

27. Respondent contends Petitioner consented or acquiesced to BLSJ's removal to the United States. Respondent also contends Mexico poses a grave risk of harm to BLSJ due to inadequate medical

---

**30.** *Petitioner's Exhibits,* Exhibit 25 at 6 (*.Letter from Mexican Consulate*) [hereinafter *Letter from Mexican Consulate*].

**31.** *Letter from Mexican Consulate, supra* note 30, at 6.

**32.** *Letter from Mexican Consulate, supra* note 30, at 8.

care, risk of disease, high rates of criminal activity, and abuse.

### a. Consent and Acquiescence

■ 28. Respondent has the burden of proving Petitioner's consent or acquiescence to Respondent removing BLSJ from Mexico by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

■ 29. Under Article 13(a) of the Convention, "the consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted removal or retention." Larbie v. Larbie, 690 F.3d 295, 308 (5th Cir. 2012) (quoting Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005)) (internal quotations omitted).

■ 30. The defenses of consent and acquiescence are to be construed narrowly. Baxter, 423 F.3d at 371.

■ 31. Consent does not require any formal declarations by the petitioner, but focuses on the subjective intent as "evidenced by the petitioner's statement or conduct, which can be rather informal." Id.

■ 32. Acquiescence focuses on the left-behind parent's subjective intent after removal or retention.

■ 33. Unlike consent, "acquiescence ... requires either an act or statement with the requisite formality, such as testimony in a judicial proceeding, a convincing renunciation of rights, or a consistent attitude of acquiescence over a significant period of time." Id. (citing Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996)).

34. Respondent testified that he and Petitioner agreed BLSJ should move to the United States with Petitioner. Respondent contends Petitioner's delay in taking action to have BLSJ returned to Mexico is evidence of Petitioner's consent to BLSJ's removal.

35. On March 31, 2016, approximately nine weeks after BLSJ's removal, Petitioner filed an application for return under the Convention with the Central Authority in Mexico. On October 4, 2016, Petitioner filed this lawsuit. Although Petitioner did not file suit in the United States until approximately eight months after BLSJ was removed from Mexico, Petitioner took affirmative steps prior to that time to determine BLSJ's location and seek her return to Mexico. The Court therefore finds the amount of time between BLSJ's removal and the filing of this lawsuit insufficient to establish consent or subsequent acquiescence. See Delgado v. Osuna, No. 4:15-CV-003060-CAN, 2015 WL 5095231, at *12 (E.D. Tex. Aug. 28, 2015) (eight-month delay between requesting return of children and filing suit was not sufficient to establish consent or acquiescence), aff'd, 837 F.3d 571 (5th Cir. 2016).

36. Further, Petitioner never mentioned to witnesses Loreto, Angeles, and Dr. Cruz that Petitioner had agreed to Respondent bringing BLSJ to the United States. Respondent's witness, Garcia, was not aware of any agreement between Petitioner and Respondent regarding BLSJ's removal to the United States.

37. Multiple text messages sent shortly after BLSJ was removed also indicate Petitioner did not consent to BLSJ's removal.

38. Respondent also contends a string of text messages between the parties, sent between August and November 2016, establish Respondent acquiesced to BLSJ's removal.

39. Multiple text messages sent between August and November 2016 indicate Petitioner's apparent intent to reconcile with Respondent as well as Petitioner's desire to be with BLSJ. These text messages, however, are not of sufficient certainty or formality to establish Petitioner's acquiescence to Respondent's permanent removal of BLSJ to the United States.

40. The Court finds Respondent failed to establish by a preponderance of the evidence that Petitioner consented or acquiesced to BLSJ's removal.

### b. Grave Risk

41. Respondent has the burden of proving grave risk or an otherwise intolerable situation by clear and convincing evidence. 22 U.S.C. § 9003 (e)(2)(A).

42. Under Article 13(b) of the Convention, grave risk must be narrowly construed; otherwise, a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes. *England*, 234 F.3d at 271.

43. Courts have generally recognized two types of grave risk or intolerable situations under Article 13(b): sending a child to a zone of war, famine, or disease; or cases of serious abuse or neglect. *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003).

44. An "intolerable situation" must be grave and is "not intended to encompass return to a home where money is in short supply, or where educational and other opportunities are more limited than in the requested state." *Baxter*, 423 F.3d at 373 (as defined by the United States Department of State in *Hague International Child Abduction Convention, Text and Legal Analysis*, 51 Fed. Reg. 10494, 10510 (1988)).

45. Respondent contends returning BLSJ to Mexico poses a grave risk to BLSJ because (1) the healthcare available to BLSJ in Mexico is inadequate; (2) there is an increased risk of disease in the area of Mexico to which Petitioner seeks BLSJ's return; (3) there is a high crime rate in the area of Mexico to which Petitioner seeks BLSJ's return; and (4) BLSJ was abused by Petitioner or Petitioner's family. The Court addresses each contention in turn.

46. Regarding the healthcare available to BLSJ in Mexico, the Guadalajara Hospital is equipped to provide BLSJ with the necessary treatment for her Anti–NMDA. Respondent conceded that the Houston Hospital did not pursue any new treatment for BLSJ's Anti–NMDA.

47. A Houston Hospital doctor noted in BLSJ's medical records a possibility that BLSJ could have a chromosomal abnormality incident to her Anti–NMDA.[33] But Dr. Cruz testified that chromosomal abnormalities, if present, are present at birth, and BLSJ did not have such abnormalities at birth. Further, Dr. Cruz testified that there is no medical treatment for chromosomal abnormalities. Respondent did not offer any expert testimony to rebut Dr. Cruz's testimony.

48. Respondent has failed to establish by clear and convincing evidence that the healthcare available to BLSJ in Mexico poses a grave risk to BLSJ.

49. As to the alleged risk of disease in Mexico, there was no evidence offered in this regard-only the testimony of Respondent's counsel during summation that "there is no mosquito control there."

50. Dr. Cruz, however, did not have any concerns about BLSJ's living conditions in Mexico or their effects on BLSJ's medical health.

51. Respondent has failed to establish by clear and convincing evidence that a risk of disease in Mexico poses a grave risk to BLSJ.

52. Nor are Respondent's general allegations of high criminal activity near Lagos de Moreno, Jalisco, Mexico sufficient to establish by clear and convincing evidence that returning BLSJ to Mexico po-

---

**33.** *Petitioner's Exhibits,* Exhibit 24 at 1.

ses a grave risk. *See Sierra v. Tapasco*, No. 4–.15–CV–00640, 2016 WL 5402933, at *10 (S.D. Tex. Sept. 28, 2016) (Harmon, J.) ("[Respondent's] general allegations of high crime in Mexico City are insufficient to establish her grave risk of harm defense."), *appeal docketed*, No. 16–20660 (5th Cir. Sept. 29, 2016).[34]

53. Finally, Respondent contends there is a grave risk of physical or psychological harm to BLSJ if she is returned to Mexico because Petitioner allegedly physically abused BLSJ. Respondent testified that, at various times, Petitioner returned BLSJ to Respondent with marks on her chin, nose, and forehead. Respondent also testified that BLSJ had a laceration across her stomach which Respondent suspected resulted from abuse. However, Respondent reported to the DFPS employee that the scar on BLSJ's stomach was from a prior surgery.

54. Petitioner denied ever physically abusing BLSJ, and Respondent's witness, Garcia, never witnessed any abuse and does not have any concerns about BLSJ being in Petitioner's care. Further, Respondent never reported any abuse to Dr. Cruz or any Mexican authority, and Dr. Cruz did not find any signs of abuse during any medical examination of BLSJ.

55. Respondent has failed to establish by clear and convincing evidence that BLSJ faces a grave risk of physical or psychological abuse if BLSJ is returned to Mexico.

### D. Attorneys' Fees

56. Any court ordering the return of a child shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, and transportation costs related to the return of the child, unless respondent establishes that such order would be clearly inappropriate. 22 U.S.C. § 9007(b)(3). Petitioner shall submit to this Court her motion for fees pursuant to the lodestar method.

### E. Summary

57. The Court finds that Petitioner Yolanda Sanchez Tavarez has proven by a preponderance of the evidence that BLSJ was wrongfully removed from her habitual residence in Mexico. The Court further finds that Respondent Michael Jarrett has failed to prove by a preponderance of the evidence that Petitioner consented or acquiesced to Respondent's removal of BLSJ from Mexico. Nor has Respondent proven by clear and convincing evidence that there is a grave risk that BLSJ's return to Mexico would expose BLSJ to physical or psychological harm. Accordingly, the Petition for Return of Child is granted.

### IV. CONCLUSION

Based on all of the foregoing, the Court hereby

**ORDERS** that the Verified Petition for the Return of the Child to Petitioner is **GRANTED.** The Court further

**ORDERS** that the child, BLSJ, be promptly returned to Mexico with Petitioner Yolanda Sanchez Tavarez.

The Court will issue a separate Final Judgment.

### FINAL JUDGMENT

This Court has contemporaneously issued its Findings of Fact and Conclusions

---

34. *See also Bernal*, 923 F.Supp.2d at 920–21 (finding no grave risk based on cartel violence in Mexico, even when children witnessed violence and had been stopped by cartel members); *Vazquez v. Estrada*, Civil Action No. 3:10-CV-2519-BF, 2011 WL 196164, at *5 (N.D. Tex. Jan. 19, 2011) (Stickney, Mag.) (finding evidence of a surge of violent activity in Monterrey, Mexico and increased danger in Petitioner's Mexican neighborhood insufficient to prove grave risk).

642

of Law in the above-styled matter. Accordingly, based on the findings of fact, conclusions of law, and analysis set forth in the Court's contemporaneously dated order, the Court hereby

**ORDERS** that the Verified Petition for the Return of the Child to Petitioner is **GRANTED.** The Court further

**ORDERS** that the child, BLSJ, be promptly returned to Mexico with Petitioner Yolanda Sanchez Tavarez.

**THIS IS A FINAL JUDGMENT.**