# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-11541

United States Court of Appeals
Fifth Circuit

**FILED**

January 23, 2018

Lyle W. Cayce
Clerk

ALBERTO ONTIVEROS SOTO,

Plaintiff - Appellee

v.

VERONICA LEMUS CONTRERAS,

Defendant - Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before SMITH, BARKSDALE, and HIGGINSON, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Veronica Lemus Contreras (Lemus), a native and citizen of Mexico residing in the United States, challenges the denial of her grave-risk defense to Alberto Ontiveros Soto's (Ontiveros) seeking return of their child, A.O.L., to Mexico pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention), 24 Oct. 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99–11. At issue is whether the court committed two legal errors in concluding Lemus failed to prove, by the requisite clear and convincing evidence, the existence of a "grave risk that [A.O.L.'s] return would

No. 16-11541

expose [him] to physical or psychological harm or otherwise place [him] in an intolerable situation". Hague Convention, art. 13(b). AFFIRMED.

I.

Lemus and Ontiveros married in 1995, and have three children. The family resided in Mexico before Lemus came to the United States with two of the three children—A.O., female, age 15, and A.O.L., male, age 8—to escape alleged abuse by Ontiveros. Although their familial problems began much earlier, the couple "mutually decided" in September 2014 to file for divorce in Mexico.

In April 2015, Lemus told Ontiveros she and the children were going to a party in another town, a three-hour trip. Instead, she came to the United States with A.O. and A.O.L. Lemus sought political asylum in the United States; her application is pending. After learning the location of his wife and children, Ontiveros pursued in district court a petition—originally filed in Mexico—for return of an abducted child (A.O.L.) under the Hague Convention. (A.O.L. was the only child subject to the petition because the Hague Convention does not apply to children, such as A.O., over 16; at the time of the bench trial, she was past 16 years of age. Hague Convention, art. 4.)

At a bench trial, the parties presented incompatible versions of events leading to Lemus' departing Mexico. She accused Ontiveros of, *inter alia*: physically abusing her and their daughter, A.O.; psychologically abusing the entire family; committing acts of violence against extended family members; and committing adultery. Although, with one exception, Ontiveros contested her accusations, he accused Lemus of, *inter alia*: committing adultery, incurring excessive debts, and assaulting him. To these ends, six witnesses testified: Ontiveros, Lemus, A.O., Soledad Contreras Lemus (Lemus' sister, hereinafter, Contreras), A.O.L., and Edith Sauno (their neighbor in Mexico).

Ontiveros testified he and Lemus fought because she was financially irresponsible.  He admitted to having one physical altercation early in the marriage, when he gave her "some spankings with the hand".  He claimed Lemus often assaulted him, and denied further physical altercations.  He stated he and Lemus, both represented by counsel, reached a divorce agreement, and he gave her at least 2,200 pesos a week to support the children, even though the divorce fell through.  He testified, unrebutted, that, before A.O.L. was removed from Mexico, the two saw each other almost every day; they would eat meals and play soccer; and A.O.L. would "stay and spend the night with [Ontiveros]".  Also unrebutted was that Ontiveros never physically abused A.O.L.

Conversely, Lemus described her relationship with Ontiveros as "slow torture", stating he beat her almost daily (or at least monthly) during their relationship.  She recounted occurrences of alleged abuse:  he beat her with a belt in the shower when she was pregnant with A.O.L.; he fought her brother when he confronted Ontiveros; and he assaulted A.O. and Contreras for trying to protect Lemus, throwing A.O. and Lemus onto the ground and into a garden rail.  She stated he also psychologically abused her and the children, with A.O.'s wanting to hang herself and A.O.L.'s wetting the bed.  She testified the Mexican police and district attorney refused to help her, forcing her to flee to the United States.

Lemus' testimony, however, was at times inconsistent.  Although she described Ontiveros' throwing A.O. into the garden rail, she also testified he "never got into a fight or other physical altercation with any of [the] children"; was inconsistent in describing the frequency of Ontiveros' physical abuse; made confused and incredible statements regarding her inability to obtain a divorce; and, after stating Ontiveros owned "four houses and [a] warehouse",

then stated he "[did not] have a place where he [could] go and eat steadily much less [A.O.L.] will have a place like that".

Lemus was also impeached on cross-examination. For example, when confronted with her signed affidavit, prepared for an *ex parte* proceeding in Texas state court, she accused Ontiveros of forging her signature. The affidavit erroneously stated that, "[i]f it were safe for [her] to do so, [she] would get a divorce", even though she had filed, with Ontiveros, a joint, voluntary petition for divorce in Mexico.

The daughter removed to the United States, A.O., testified favorably for Lemus, but in a sometimes contradictory fashion. She stated her parents fought every time Ontiveros drank (and he drank often), but she only saw her parents fight four times, the first when she was seven. She felt "sad" and "scared" when her parents "fought", and she corroborated the incident where Ontiveros threw her and Lemus on the ground into the garden rail. She said she did not want to live with her father because he "was very bad to [Lemus]". On cross-examination, A.O. testified she was "nervous" about testifying because she was "afraid [Lemus] might get in trouble" and even "be put in jail" if she (Lemus) lost the case.

Contreras testified Lemus and Ontiveros engaged in physical fights, and she had "several fights" with Ontiveros "because [she was] trying to defend [her] sister". Other than corroborating Ontiveros' fighting Lemus' brother, however, Contreras could not establish personal knowledge of such fights. She knew only about the abuse, "[b]ecause [Lemus] would always arrive crying to talk to us about how he mistreated her".

Answering mostly in "yes" or "no" form, A.O.L. testified on direct examination only that he: had seen Ontiveros hit Lemus; liked the United States; wanted to live with his mother; and did not want to return to Mexico. On cross examination, he admitted he did "fun stuff", playing soccer and eating

No. 16-11541

meals, with Ontiveros and had smiled at him in the courtroom's hallway.  He also stated he would be "happy" "if [he] got to do fun stuff with [Ontiveros] sometimes and do fun stuff with [Lemus] sometimes".

Ontiveros called Sauno as a rebuttal witness.  She testified she lived next door to the family and never heard any yelling or saw any abuse.  In addition, she testified to Lemus' reputation: "She cheated on her husband a lot" and "[is] well known for owing people money".  On cross examination, Sauno conceded she lives in the United States and only travels to Mexico between one and three times a year.

Following the bench trial, the court rendered findings of fact and conclusions of law, ruling A.O.L. was wrongfully removed and Lemus failed, *inter alia*, to prove, by clear and convincing evidence, grave risk to A.O.L. *Ontiveros v. Lemus*, No. 3:16-CV-00867-N, slip op. at 7 (N.D. Tex. 18 Oct. 2016). For that grave-risk defense (the only Hague Convention defense raised on appeal), the court found, *inter alia*:

> [Lemus]'s allegations of abuse – that [Ontiveros] physically and psychologically abused her, sometimes in front of their children, and that [Ontiveros] allegedly physically assaulted their daughter on one occasion – are in conflict with [Ontiveros'] testimony. [Ontiveros] testified that he could recall one instance in which he and [Lemus] engaged in a physical fight, but [Ontiveros] denied any other instances of abuse. Because neither side is able to provide *objective evidence*, [Lemus'] allegations of abuse fail to rise to the level of clear and convincing evidence of a grave risk of harm.

*Id.* at 4 (emphasis added).

The court also found "[Lemus] did not provide any evidence that [Ontiveros] abused or neglected [A.O.L.]".  *Id.*  And, as for A.O.L.'s testimony, it made the following finding:

5

No. 16-11541

> The Court finds that [A.O.L.'s] responses as to where he would like to live were equivocal. Though in response to questioning by his mother's attorney, [A.O.L.] responded that he does not want to return to Mexico, he also responded to his father's attorneys that he enjoys spending time with his father and that he would prefer to split his time between both of his parents.

*Id.* at 5.

Because the court concluded Lemus' grave-risk and other Hague Convention defenses failed, Ontiveros was "entitled to immediate return of [A.O.L.] . . . for [a] custody determination" in Mexico. *Id.* at 7. In response, Lemus quickly filed a motion to stay the judgment pending appeal.

In denying the motion, the court replied to Lemus' stating a basis for the stay was its "objective evidence" finding, which she would challenge on appeal. The court stated, *inter alia*: "The [c]ourt did not disregard the testimony of the two children . . . rather, [it] noted that there was no evidence of physical abuse of [A.O.L.], which is the more pertinent issue for likelihood of grave risk of harm to [A.O.L.]". *Ontiveros v. Lemus*, No. 3:16-CV-00867-N, Order at 2 (N.D. Tex. 25 Oct. 2016).

## II.

Lemus contends the court improperly imposed a heightened standard by committing two legal errors in rejecting her grave-risk defense:  it required "objective evidence" and abuse to the child. (Concomitantly, for her final issue, she asserts that, "[u]nder the proper legal standard, [she] satisf[ied] the grave risk exception to the Hague Convention".  Because, as discussed *infra*, the court did *not* impose an incorrect standard, Lemus' final issue is moot.)

"[T]he Convention reflects a design to discourage child abduction". *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1235 (2014).  Therefore, "[u]nder the Convention, courts in contracting countries must return a wrongfully-

6

removed child to his country of habitual residence". *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 342–43 (5th Cir. 2004) (citing Hague Convention, art. 12). The Convention's return-remedy "is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence". *Abbott v. Abbott*, 560 U.S. 1, 20 (2010).

Nevertheless, those who abduct a child may assert several "narrow" affirmative defenses. 22 U.S.C. § 9003(e)(2); Hague Convention, arts. 12, 13, 20. As noted, Lemus presents on appeal only the grave-risk defense: the court "is not bound to order the return of the child if the [abductor]" establishes, by clear and convincing evidence, "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation". Hague Convention, art. 13(b).

"[F]indings of grave risk are rare". *Delgado v. Osuna*, 2015 WL 5095231, at *13 (E.D. Tex. 28 Aug. 2015), *aff'd*, 837 F.3d 571 (5th Cir. 2016). "The person opposing the child's return must show that the risk to the child is grave, not merely serious." Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494-01, 1986 WL 133056 (Mar. 1986). The principles underlying the Hague Convention require the "grave risk must be narrowly construed; otherwise, a broad interpretation would cause the exception to swallow the rule and transform the Convention into an arena for custody disputes". *Tavarez v. Jarrett*, 252 F. Supp. 3d 629, 640 (S.D. Tex. 2017) (citing *England v. England*, 243 F.3d 268, 271 (5th Cir. 2000)). In that regard, courts in Hague Convention cases "must strive always to avoid a common tendency to prefer their own society and culture"; the Hague Convention "deter[s] child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes". *Abbott*, 560 U.S. at 20.

No. 16-11541

In line with the objectives of the Hague Convention, the abductor must, as noted, prove grave risk by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).  This standard "establishes a strong presumption favoring return of a wrongfully removed child".  *Danaipour v. McLarey*, 286 F.3d 1, 13 (1st Cir. 2002).  "Clear and convincing evidence" is

> that weight of proof which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts" of the case.

*In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992) (quoting *Cruzan by Cruzan v. Dir. Missouri Dep't of Health*, 497 U.S. 261, 285 n.11 (1990)).

In resolving disputes under the Hague Convention, factual findings are reviewed for clear error; conclusions of law, *de novo*.  *Larbie v. Larbie*, 690 F.3d 295, 306 (5th Cir. 2012).  And, in reviewing factual findings from a bench trial, we "must give due regard to the trial court's opportunity to judge the witnesses' credibility".  Fed. R. Civ. P. 52(a)(6).  On the other hand, if "a finding of fact is based on a misconception of the underlying legal standard, an appellate court is not bound by the clearly erroneous standard of review".  *Pavlides v. Galveston Yacht Basin, Inc.*, 727 F.2d 330, 339 n.16 (5th Cir. 1984).

As discussed *supra*, in denying a stay pending appeal, the court revisited its "objective evidence" finding, presented as a basis for the stay, by stating it, "did not disregard the testimony of the two children . . . [, but] rather, . . . noted that there was no evidence of physical abuse of [A.O.L.], which is the more pertinent issue for likelihood of grave risk of harm to [A.O.L.]".  *Ontiveros*, Order at 2.  Ontiveros contends the district court's order clarified its findings of fact and conclusions of law, revealing the absence of legal error.

For purposes of this appeal, we do not consider the district court's explanation.  Federal Rule of Civil Procedure 52 requires the district court

No. 16-11541

make separate findings of fact and conclusions of law; and, as stated, its findings are reviewed for clear error.  Fed. R. Civ. P. 52(a)(1); *see Garner v. Kennedy*, 713 F.3d 237, 242–43 (5th Cir. 2013) (Rule 52 findings of fact and conclusions of law serve three purposes, two of which are:  "engendering care by the court in determining the facts"; and "enabl[ing] appellate courts to carry out a meaningful review").  A party can move the court to amend its findings of fact under Rule 52(b), but Ontiveros did not do so.  In short, the court's ruling on the stay motion did not amend its bench-trial findings.  Fed. R. Civ. P. 52(b); Steven S. Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 52 (purpose of motion to amend is to "permit a party to request clarification or supplementation of the facts found to aid the appellate court in understanding the factual issues at trial").

A.

For the first of her two claims of legal error, reviewed *de novo*, Lemus asserts the court improperly imposed a heightened legal standard in ruling that, "[b]ecause neither side [was] able to provide objective evidence, [her] allegations of abuse fail to rise to the level of clear and convincing evidence of a grave risk of harm".  *Ontiveros*, slip op. at 4.  Lemus asserts correctly the Hague Convention does not require objective evidence in proving the grave-risk defense by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(A).  Nevertheless, for the following reasons, the court did not require such evidence; therefore, it did not impose a heightened legal standard.

Review of the court's findings of fact and conclusions of law reveals its "objective evidence" statement was simply part of a factual finding that the evidence Lemus presented was not sufficient to satisfy her clear-and-convincing-evidence burden.  First, the court made this statement in its findings-of-fact section, and did not state objective evidence is required to prove grave risk.  Instead, it recited the correct legal standard:  Lemus had to "prove[]

9

by clear and convincing evidence that . . . [Ontiveros] seriously abused or neglected [A.O.L.], or that there is otherwise a grave risk of harm to [him] if [he] returns to Mexico for a custody determination". *Ontiveros*, slip op. at 7.

Further, directly preceding the court's stating "neither side [was] able to provide objective evidence" is its statement that "[Lemus'] allegations of abuse . . . are in conflict with [Ontiveros'] testimony". *Id.* at 4. Finding the testimony was in "conflict" and was not "objective" is consistent with the record. (Along that line, Lemus does not contest the definition of "objective" urged by Ontiveros: "based on externally verifiable phenomena", or "[w]ithout bias or prejudice". Black's Law Dictionary (10th ed. 2014).)

It goes without saying that Ontiveros and Lemus were extremely interested in the outcome of the case. Contreras would naturally be biased in favor of her sister, and could not establish personal knowledge of abuse regardless. A.O.'s testimony was biased, *inter alia*, because "a female friend told" her Lemus would "be put in jail" if she lost the case. The court expressly found A.O.L.'s responses concerning "where he would like to live were equivocal". *Ontiveros*, slip. op. at 5. On the one hand, A.O.L. testified he did not want to return to Mexico; on the other hand, that he would like to spend time with both Ontiveros and Lemus, after having earlier smiled at his father in the hallway.

In sum, the record demonstrates that the court's reference to "objective evidence" does not compel ruling that the findings of fact were "based on a misconception of the underlying legal standard". *Pavlides*, 727 F.2d at 339 n.16.

### B.

Underlying Lemus' other claim of legal error is the grave-risk defense's requiring her showing a "grave risk that [A.O.L.'s] return [to Mexico] would expose [him] to physical or psychological harm or otherwise place [him] in an

intolerable situation". Hague Convention, art. 13(b). In that regard, she contends the court imposed a heightened legal standard in finding "[Lemus] did not provide any evidence that [Ontiveros] abused or neglected [A.O.L.]". *Ontiveros*, slip op. at 4.

To support this claim of legal error, Lemus cites cases holding spousal abuse could support a finding of grave risk to a child. *E.g.*, *Madrigal v. Tellez*, 848 F.3d 669 (5th Cir. 2017); *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000). But, those cases do not require finding grave risk to the child when the child's parent was abused. *E.g.*, *Madrigal*, 848 F.3d at 676–77. They stand only for the proposition that sustained spousal abuse can, in some instances, create such a risk. *Id.* Indeed, a bright-line rule that allegations of spousal abuse create grave risk to a child would circumvent the Hague Convention's principle that "the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence". *Abbott*, 560 U.S. at 20.

Much like the "objective evidence" statement discussed *supra*, review of the court's findings of fact and conclusions of law reveals it did not impose a heightened standard. Again, the court made its statement about no evidence of abuse or neglect of A.O.L. in the context of weighing the evidence, in its findings-of-fact section, in the paragraph following its finding the evidence was "in conflict". The court never stated abuse to Lemus could not produce the requisite grave risk to A.O.L., but, instead, recited the correct legal standard.

Our precedent is instructive. In *Madrigal*, a mother sought to establish the grave-risk defense with evidence of an email stating she was in danger of being killed by her husband. 848 F.3d at 676. She asserted that, in denying her defense, presented through a Rule 60(b) motion, "the district court necessarily concluded that threats to [her] could not create a grave risk of harm to the Children, and she cite[d] cases to support the proposition that a grave

risk of harm may arise by virtue of a child's proximity to actual or threatened violence against his or her parent". *Id.* (quotation marks omitted).  Our court ruled that, "the denial of [the mother]'s [Rule 60(b)] motion does not require an assumption that threats against a parent can never create a grave risk of harm to his or her children, and there is no indication that the district court labored under such an assumption". *Id.*

As in *Madrigal*, Lemus does not show the court "labored under" the mistaken "assumption that threats against a parent can never create a grave risk of harm to his or her children". *Id.*

### III.

For the foregoing reasons, the judgment is AFFIRMED.